**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DONALD EUGENE GATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:11-cv-00040 (RWR) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendants, the District of Columbia, Retired Metropolitan Police Detective Ronald S.

Taylor, Retired Metropolitan Police Detective Norman D. Brooks and Retired Metropolitan

Police Lieutenant John C. Harlow, through undersigned counsel, move this Court under Fed. R.

Civ. P. 56(c) to enter summary judgment on the following grounds:

1.      Plaintiff's 42 U.S.C. § 1983 case rests on speculation and false logic: that because

the Superior Court vacated his 1982 conviction for rape and murder because of subsequent DNA

testing, the former police officer Defendants must have fabricated the evidence against him.  To

prevail, the Plaintiff must prove that he was deprived of due process through an unfair trial, and

that the alleged misconduct of the Defendants, and not the evidence against him, was the cause

of his conviction.  This he cannot do.

2.      Summary Judgment should be granted on the basis of laches.  The Plaintiff's

constitutional claims under § 1983 do not depend upon subsequent advances in DNA testing or

skepticism about the reliability of hair analysis.  If there was police misconduct that was material

to his conviction, he could have uncovered it at the time and sought the reversal of his conviction

years before he did.  Besides the Plaintiff's undue delay, there is extreme prejudice to the

Defendants.

3.      The within Motion for Summary Judgment seeks judgment in favor of the three individual Defendants on Count II of the Complaint (due process), Count III (failure to intercede), and Count IV (conspiracy), on the merits and based on qualified immunity.  There is no affirmative evidence that the individual Defendants deprived the Plaintiff of liberty through the acts alleged, specifically the fabrication of evidence, the failure to disclose exculpatory and impeachment evidence, and an unduly suggestive photo array.  No reasonable police officers in their positions would have believed that they deprived the Plaintiff of the due process right to a fair trial.

4.      Summary Judgment must also be granted on Count V of the Complaint (municipal liability against the District of Columbia).  Because there was no underlying due process violation, the District cannot be held responsible.  In the alternative, no policy or custom of the District caused the alleged constitutional violation.

5.      In the within Motion, the Defendants do not request Summary Judgment on Count I of the Complaint, which seeks compensation under D.C. Code §§ 2-421, et seq. and alleges unjust imprisonment.

6.      The Defendants rely on an accompanying Memorandum of Points and Authorities, Defendants' Statement of Undisputed Facts, and Exhibits.  They have submitted a proposed Order.

**DATED:  June 23, 2013**                    Respectfully submitted,

                                             IRVIN B. NATHAN
                                             Attorney General for the District of Columbia

                                             GEORGE C. VALENTINE
                                             Deputy Attorney General, Civil Litigation Division

/s/ Kimberly Matthews Johnson
KIMBERLY M. JOHNSON [435163]
Chief, General Litigation Section 1

/s/   Wayne C. Beyer
WAYNE C. BEYER [452245]
Assistant Attorney General
441 4th Street, N.W., 6th Floor-South
Washington, D.C.  20001
Tel: (202) 442-9891
Fax: (202) 730-0637
Wayne.Beyer@dc.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DONALD EUGENE GATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 1:11-cv-00040 (RWR) |
| | ) | |
| DISTRICT OF COLUMBIA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

#### Preliminary Statement and Allegations in the Complaint

Plaintiff's 42 U.S.C. § 1983 case rests on speculation and false logic: that because the Superior Court vacated his 1982 conviction for rape and murder, the former police officer Defendants must have fabricated the evidence against him.  To prevail, the Plaintiff must prove that he was deprived of due process through an unfair trial, and that the alleged misconduct of the Defendants, and not the evidence against him, was the cause of his conviction.  This he cannot do.

The Plaintiff's 38-page Complaint (excluding attachments) has five Counts.  In the within Motion, the Defendants do not seek summary judgment on Count I.  Count I is brought under D.C. Code §§ 2-421, et seq. and alleges unjust imprisonment.  (Complaint, ¶¶ 111-116.)  It alleges that "[o]n September 16, 1982, the Plaintiff was unjustly convicted and subsequently imprisoned for criminal offenses contained in the District of Columbia Official Code; specifically, rape while armed, D.C. Code §§ 22-2801, -3202; felony murder while armed and attempting a rape, *id*. §§ 22-2401, -3202; and carrying a pistol without a license, *id*. D.C. Code

§§ 22-3204." (Complaint, ¶ 112.) The Complaint further alleges that the Plaintiff's "convictions for these crimes have been vacated on the ground that he is actually innocent of the offenses of which he was convicted, as appears from the Certificate of Innocence issued by [the D.C. Superior] Court, which vacated his convictions." (Complaint, ¶ 113.)

Count II is brought against former Metropolitan Police Department (MPD) detectives John Harlow, Norman Brooks, and Ronald Taylor. (Complaint, ¶¶ 117-124.) It alleges that the named Defendants violated the Plaintiff's due process right to a fair trial under the Fifth and Fourteenth Amendments of the United States Constitution,[1] enforceable through 42 U.S.C. § 1983. Specifically, the Plaintiff alleges that the Defendants fabricated evidence that influenced the jury, suppressed material, exculpatory and impeaching evidence, and deliberately and improperly suggested defendant Gerald Smith's identification of the Plaintiff." (Complaint, ¶ 118; see also Complaint, ¶¶ 119-124.) Smith, a co-defendant herein, was a prosecution witness who testified the Plaintiff had confessed that he had committed the rape/murder of C.S.[2]

Count III of the Complaint is also brought against the three former MPD detectives for allegedly failing to intercede in violation of the Fifth and Fourteenth Amendments, enforceable through 42 U.S.C. § 1983. (Complaint, ¶¶ 125-130.) Specifically, the Plaintiff alleges that the Defendants had opportunities to intercede on behalf of the Plaintiff to prevent the violation of his due process right to a fair trial, but, due to their intentional conduct and/or reckless or deliberate indifference, they declined or refused to do so. (Complaint, ¶ 126.)

---

[1]     Because the District of Columbia is not a state, the Fourteenth Amendment of the Constitution is not applicable, and the Due Process Clause of the Fifth Amendment governs. *Bolling v. Sharpe*, 347 U.S. 497 (1954); *Rice v. District of Columbia*, 715 F.Supp.2d 127, 133 (D.D.C. 2010).

[2]     Although the names of sexual assault victims in this case have appeared in the public record, the Defendants refer to them by their initials.

Count IV of the Complaint is also brought against the three former MPD detectives, alleging they conspired to violate the Plaintiff's Fifth and Fourteenth Amendment due process right to a fair trial, enforceable through 42 U.S.C. § 1983.  (Complaint, ¶¶ 131-130.)

Count V of the Complaint purports to be a municipal liability claim, enforceable through 42 U.S.C. § 1983, against the District of Columbia for maintaining an unconstitutional policy or custom and for failing to supervise and train police officers, detectives and investigators. (Complaint, ¶¶ 136-142.)  The Plaintiff asserts that, as of the time of the C. S. rape/murder, the District had a "policy, practice or custom of fabricating evidence, suggesting identification, and withholding exculpatory and impeachment evidence through the use of informants, thus depriving criminal defendants of their clearly established constitutional rights to due process of law and a fair trial under the Fifth and Fourteenth (sic) Amendments . . .."  (Complaint, ¶ 137.)

Count V of the Complaint also alleges that the District had a policy of failing to train, supervise, and discipline police officers, detectives and investigators.  (Complaint, ¶¶ 138-142.) Specifically, the Plaintiff alleges that the District "systematically failed to adequately train its police officers, detectives and investigators not to fabricate evidence, suggest identification, or withhold material exculpatory and impeachment evidence from prosecutors through the use of informants."  (Complaint, ¶ 138.)  The Plaintiff contends that the failures to train, supervise and discipline "amounted to deliberate indifference to the constitutional rights of criminal defendants, including [the Plaintiff], and were the moving force behind defendant Smith's inculpatory statements, causing [the Plaintiff's] arrest, prosecution, and incarceration . . .." (Complaint, ¶ 142.)

The Plaintiff seeks damages, including punitive damages against the named individual Defendants, attorneys' fees and other costs.  (Complaint, Relief Sought.)

1.      Factual Background; Gates' Pretrial Motions, Evidence at the Gates
        Criminal Trial, Issues on Appeal, Motions for New Trial, and Vacation of
        Gates' Conviction

        a.      Factual Background

On June 23, 1981, MPD homicide detectives Ronald Taylor and Norman Brooks

"caught" a new case, the rape/murder of a Georgetown University student who was found nude

and with five gunshots to the head off Rock Creek Park in an area between the Watergate and the

Georgetown canal.  (See, e.g., Ex. #1, U.S. Brief to D.C. Court of Appeals, at 4-8; page citations

to the trial transcript omitted throughout.)  The Mobile Crime Unit and Medical Examiner's

Office took pubic hair combings and vaginal swabs (*Id.*), and the homicide investigators

interviewed C.S.'s roommates and employees of the law firm where she worked part-time.

About a week after the rape/murder, Gerald Smith, an informant who had worked with John

Harlow, a robbery detective at the time, said he had information about the murder.  A man he

drank with in the park near the crime had confessed to it.  This was the "first significant lead in

the case."  (*Id.* at 6.)  Smith met with the homicide detectives within a week of the murder and

then in August identified Donald Gates from a photo array as the man who had confessed to the

C.S. rape/murder.  (*Id.* at 8)

        Gates had been identified and arrested on July 20, 1981 for the March 10, 1981 rape of

another woman, J.F., in Rock Creek Park that was investigated by the U.S. Park Police.  In

connection with that crime, Gates provided pubic hair samples to the U.S. Park Police that the

FBI lab said microscopically matched the pubic hair left on the victim's body.  (Ex. #2, Motion

to Enforce Grand Jury Directive and Opposition; the briefing is voluminous and some has been

omitted.)  At that point, in November of 1981, with the confession and the hair match, the MPD

and the U.S. Attorney's Office proceeded with a warrant for Gates' arrest.  (Ex. #3, Affidavit in

Support of Warrant for Arrest of Donald Gates.)  Gates had been in jail for seven months for

desertion from the United States Air Force, worked from time to time as a day laborer, slept in

shelters and an abandoned car, and had an admitted drinking problem that contributed to his

criminal activity.  (Ex. #4, Donald Gates' dep. at 20-24.)  He had admitted to sexually assaulting

a young woman near Union Station in 1981 (*Id*. at 24-27; see also Ex. #1, at 9, n.13.), and

attempted to rob and sexually assault a woman, N.B., 19 days before the C.S. rape/murder in

essentially the same location in Rock Creek Park, and that latter evidence was later used to

buttress the case against him.  (*Id*. at 29-37).

> b.    Gates' Pretrial Motions

Gates' defense attorney, Hamilton P. Fox, III, filed a number of pre-trial motions, which

were denied.  Gates moved for disclosure of Smith, the informant's, identity.  Although the U.S.

Attorney provided the defense with Smith's prior record, the substance of his testimony, and the

benefits he would receive as a result of his cooperation (e.g., charges being dismissed), the Court

denied the motion to discover Smith's identity until it was announced on the first day of trial.

(Ex. #5, Motion for Discovery, Opposition, and Order.)

The Gates defense moved to suppress hair analysis testimony.  After Gates was arrested

on July 20, 1981, for the J.F. rape in Rock Creek Park on March 10, 1981, the FBI

microscopically matched the hair samples the U.S. Park Police took from him with pubic hairs

found on C.S.  However, Gates was ruled out as a suspect in the March 10, 1981 rape because he

was incarcerated on other charges.  The U.S. Attorney's Office subsequently obtained a grand

jury directive and court order to obtain new pubic hair samples from Gates, which the FBI also

microscopically matched with those found on C.S.'s body.  The Court denied the motion to

suppress the hair analysis testimony.  (Ex. #2.)

Gates had admitted to attempting to rob another young woman, N.B., in the same area of Rock Creek Park as the C.S. rape/murder three weeks before, on June 3, 1981.  The U.S. Attorney's Office sought to introduce that crime as "other crimes" evidence based on motive, intent, absence of mistake or accident, common scheme or plan, and identity.  The Gates defense sought to exclude that evidence.  (Ex. #6, Motion in Limine and Opposition.)  Thus, the U.S. Attorney's Office had evidence of Gates committing another crime in the same location three weeks before and a perpetrator whose pubic hair was a microscopic match with his committing the C.S. rape/murder.  The "other crimes" evidence was allowed.

The Court also considered Gates' defense motion to suppress Smith's identification of Gates from a photo array.  Defense counsel said he was shown the array, and unfortunately a line or two of the motion was cut off in the copy from court filings, but the motion suggests that the procedure, but evidently not the array itself, was unduly suggestive.  The U.S. Attorney's Office opposed the motion to suppress.  (Ex. #7, Motion to Suppress and Opposition.)  The trial court heard the motion on September 8, 1982, and denied it on September 9, 1982  (Ex. #8, Order Denying Motion to Suppress Identification), and testimony regarding Smith's identification of Gates was allowed at trial.  (Ex. #1, U.S. Brief to D.C. Court of Appeals, at 7.).  The Gates defense did not raise the issue of the suggestiveness of the identification in post-trial or appellate briefs.  The issue was fully litigated.

c.    The Prosecution's Evidence at the Gates Criminal Trial

The transcript from the Gates criminal trial has been lost or destroyed through no fault of the Defendants.  The available evidence of the issues and witness testimony presented comes from the post-trial and appellate briefing.  The U.S. Attorney's evidence consisted of: 1) Smith testified that shortly after the rape/murder he and Gates were drinking in a park near the scene

when Gates confessed that he raped and shot a young woman in Rock Creek Park; 2) An FBI

hair analyst matched Gates' pubic hair microscopically with hair found on the victim; and 3)

Gates was convicted of mugging and sexually assaulting another young woman in the same

location in Rock Creek park as the rape/murder three weeks before.  The following summary of

the testimony comes from the U.S. Attorney's brief opposing Gates' appeal to the D.C. Court of

Appeals.  (Ex. #1.)

> 1)      Gates' Confession to Smith and Disclosure of Smith's Criminal
>         Record, Payments to Him, and Leniency on Other Charges

Within a week of the murder, on June 30, 1981, Smith told Detective Taylor that he had a

conversation with a man he knew as Donald Gates, and that Gates had told him that he had

started to rob a young white woman in the park area in Georgetown and had ended up raping and

killing her.  (Id. at 6.)  At trial, the U.S. Attorney's Office produced Smith to testify about his

conversation with Gates.  (Id.)  Smith used to drink in the Washington Circle Park:

> Smith, who acknowledged his prior criminal record, testified that during the first
> six months of 1981, he went to Washington Circle about three or four times a week to
> drink with some street friends.  He would usually arrive about 9:15 a.m., and the
> gathering would typically last until 3:00 – 4:00 p.m.  The group would not stay the entire
> day at Washington Circle, but would move down Pennsylvania Avenue to other parks on
> that street.

(Id. at 6-7.)

One of the men he used to drink with was Donald Gates, who confessed to him that he

had started to rob, and then raped and murdered a young woman a few days before:

> Smith identified [Donald Gates] in court as someone he would encounter in the
> Washington Circle area during the first half of 1981.  He had seen [Donald Gates] for the
> first time in early February or March 1981, and recalled seeing him an average of once or
> twice a week thereafter.  Smith knew [Donald Gates'] first and last names and recalled
> having a specific conversation with him near the end of June, 1981, during the morning
> hours, at the park at 25th and Pennsylvania Avenue.  [Donald Gates] was "a little high"
> because the men had all been drinking.  [Donald Gates] told Smith during this
> conversation that "he went on a hell of caper a couple [of] days ago.  The caper consisted

[of] robbing a pretty, white girl.  All he had was intentions just to rob her, but she resisted.  And after she resisted, he raped her.  And then after it dawned on him what he had done, he shot her."  [Donald Gates] told Smith that the crime had occurred in a park and that he had left the victim "cut and dry."

(*Id.* at 7.)

After the conversation with Gates, Smith called Detective Harlow to provide information about his conversation with Gates:

> Right after that conversation, Smith phoned Lieutenant John Harlow of the Robbery Squad to check out the authenticity of the story and to obtain some money in return for the information.  A few days later, he spoke again with Harlow, who gave him the names of the two detectives from the Homicide Branch – Ronald Taylor and Norm Brooks.  Smith relayed to Taylor and Brooks the details of his conversation with [Donald Gates].

(*Id.*)

Smith identified a photograph of Donald Gates in a photo array as the Donald Gates who had confessed to the rape/murder.

> In the latter part of August, 1981, Smith met with Detective Taylor at Georgetown Hospital.  Taylor gave Smith a group of ten photographs and asked him to identify the person with whom he had had the conversation.  Smith immediately picked out [Donald Gates'] picture the first time he went through the photographs.  Smith testified that he was 100 per cent certain that the man whose photo he had selected (and the man whom he identified at trial, i.e., [Donald Gates]) was the one with whom he had the conversation.

(*Id.* at 7-8.)

The jury was informed about Smith's prior criminal record, the money he received and the charges that were dropped for his providing information.  Smith admitted that he had been convicted of unlawful possession of stolen mail (1971), armed robbery (1972), possession of an unregistered firearm (1975), and false pretenses (1975).  (*Id.* at 6, n.7.)

There was also trial testimony that "Smith, who had been reporting information to the police for pay for eight months to a year prior to June of 1981, was initially paid $50 and not

asked to do anything at that point.  He subsequently received another $250, and agreed to notify

the police the next time he saw [Donald Gates]."[3]  (*Id*. at 7, n.8.)  "He later received $1000 from

Crime Solvers after testifying before the grand jury about his conversation with [Donald Gates]."

(*Id*.)

The jury also heard testimony that, in exchange for his cooperation with police, Smith

received leniency on some pending charges:

> For his testimony in the grand jury and at trial, and for his information and
> cooperation with respect to two other serious felony cases, the government agreed to
> arrange for the dismissal of four cases pending against Smith – three shoplifting cases in
> Maryland and a larceny after trust case in the District of Columbia.  He received no
> promises as to the dismissal of two other shoplifting cases pending against him in
> Maryland.

(*Id*.)

### 2)   Malone's Microscopic Hair Analysis

Michael P. Malone, an FBI Special Agent with the Microscopic Analysis Unit, testified

about the results of a pubic hair analysis in which he compared pubic hair combings from the

victim with pubic hair samples from Gates.  (*Id*. at 8.)  Malone first sorted through the victim's

pubic hair combings, which had been obtained at the scene of the crime to isolate hairs not

belonging to the victim.  (*Id*.)  He found two such hairs – of African-American origin – from

among the victim's hairs and compared those two hairs with the pubic hair samples obtained

from Gates.  (*Id*.)  Malone testified that, in conducting the comparison, he tested 20 individual

microscopic characteristics, using a high powered microscope.  (*Id*.)  He testified that the two

African-American hairs matched Gates' hairs as to all 20 characteristics.  (*Id*.)  Those

---

[3]     Although the Plaintiff contends that the only way Smith could have known Gates' name
was if the detective Defendants fed it to him, it is more likely that Smith, if he did not already
know Gates' full name, made efforts to find out so that he could provide it to the detectives.

characteristics included distribution, color, the width of the medullar, distinctiveness and protrusion of scales, color of the cuticle, and density, size, and arrangement of the pigment.  (*Id.*) Malone explained that, although a hair match differs from a fingerprint match in that it cannot be said that a hair came from one person to the exclusion of all others, it was nevertheless "highly unlikely" that the hair found on the victim came from someone other than Gates.  (*Id.*)  Of the 10,000 hair examinations Malone performed over an eight-year period, there were only two instances where the hairs from two different people were so similar that he could not differentiate between them.  (*Id.* at 8-9.)

> 3)      Gates' Assault of Another Woman in the Same Area

On June 3, 1981, Gates committed a similar assault in the same area.  (*Id.* at 9.)  Over objection, the trial judge ruled that other crimes evidence was admissible to show identity, intent, and common scheme or plan.  N.B., a 28-year-old white female who weighed 120 pounds and was 5'6" tall, testified that on June 3, 1981,[4] she left work at the Kennedy Center about 5:00 p.m.  (*Id.*)  N.B., who was alone and on her way to pick up a pair of glasses she had ordered in Georgetown, walked along the Parkway and crossed the street at the Virginia Avenue crosswalk. (*Id.*)  It was rush hour and the traffic was heavy.  (*Id.*)  After crossing the street, N.B. became aware that someone was following her at a distance of two or three feet.  (*Id.* at 10.)  N.B. continued walking on the pathway in the direction of the canal towpath.  (*Id.*)  Right before the towpath, as N.B. was about to turn left, Gates came up around to her right, grabbed her arm and her purse (a large tote bag), and started pulling on the purse.  (*Id.*)  A struggle over the purse ensued, but Gates let go of the purse, grabbed N.B.'s shoulders, and pushed her to the ground on her back, as they were about a foot off the sidewalk.  (*Id.*)  Gates had lost interest in the purse

---

[4]      The Brief says 1982, but the correct date is obviously 1981.

and lay on top of N.B., "nuzzling" his face against hers and mumbling incoherently.  A biker on

the towpath and a motorist apprehended Gates, pulled him off N.B., and kept him pinned down

until police arrived and arrested him.  (*Id*.)  A closed pocket knife with a four or five inch blade

was seized from his person.  (*Id*.)  Gates pled guilty to the assault.  (*Id*. at 9, n.13.)

4)      Defendant's Evidence at Trial

Gates' defense consisted of introducing scientific evidence and challenging Smith's

credibility.  Gates' defense attorney introduced expert testimony from a professor of forensic

science.  The expert challenged Malone's testimony.  According to the expert, the "principal

study in the field . . . had concluded that the probability of taking a single hair found on a rape

victim, matching it to a hair sample from a known individual, and having an incorrect match or

false association [was] about 1 in 800."  (*Id*. at 11-12.)  A critique of that study argued that the

correct figure was not 1 in 800, but 1 in 100.  (*Id*.)  The defense expert could not say that it was

"highly unlikely" that a pubic hair matching a known source came from someone other than the

known source.  He could not offer probabilities.  (*Id*.)  The professor of forensic science and an

FBI special agent in the Forensic Serology Unit, who was called initially by the defense, testified

that Gates' blood type, A, did not match secretions found in the victim, type O.  (*Id*. at 10-13.)

Gates' defense sought unsuccessfully to introduce evidence that, because Gates was

misidentified as the perpetrator of the J.S. rape in Rock Creek Park that occurred on March 10,

1981, he was misidentified by Smith in this case.  (Ex. #1; Ex. # 9, Gates Brief to D.C. Court of

Appeals, at 5-7.)  Gates' defense attorney's cross-examination of Smith "challeng[ed] both

Smith's claims that he knew Gates and his identification [of Gates]" (Ex. #10, Gates Reply Brief

to D.C. Court of Appeals, at 20, n. 29), and "sought to show that Smith was dishonest and should

not be believed" (Ex. #1, at 44).

5)      The Verdict

However, at no phase of the trial or appeal did Gates' attorneys accuse the detectives of manufacturing the Smith testimony or of lying to prosecutors, as his attorneys now claim.  The jury evidently discounted Smith's testimony that Gates told him that the crime began as a robbery and then became a sexual assault, because the jury acquitted Gates of attempted robbery while armed and a second count of felony murder.  (Ex. #9, at 2.)  Accordingly, even though the Plaintiff speculates that the detective Defendants fed Smith the "it started as a robbery" non-public detail to bolster his credibility, that testimony was not a factor in Gates' conviction.

6)      The Prosecutor's Deposition Testimony

Brooks Harrington was an Assistant United States Attorney (AUSA) in Washington from 1978 to 1983.  (Ex. #11, John Brooks Harrington dep., at 7.)  He later became a Methodist minister in Fort Worth and founded and directs the Methodist Justice Ministry, which provides free legal representation to indigent and abused women and children.  (Id. at 9-10.)  Other AUSAs handled the arrest warrant for Gates and the initial grand jury proceedings.  (Id. at 40-44.)  Harrington was working on the Gates prosecution as an AUSA in Felony I when he became deputy chief of felony trials, but he decided to keep the case for trial.  (Id. at 45-47.)  He handled the pre-trial motions and the trial.  (Id. at 51-58.)  He was not involved in the appeal of the Gates conviction to the D.C. Court of Appeals.  (Id. at 39.)

The decision to introduce the "other crimes" evidence through the testimony of N.B. was a decision that Harrington made ("Darned right") in consultation with the chief of felony trials and the director of Superior Court operations for the U.S. Attorney's office.  (Id. at 70-73.)  The N.B. testimony was part of the prosecution's case in chief.  (Id. at 73.)

Harrington presented the testimony of the FBI hair analyst, Malone, at trial.  (*Id*. at 73-74.)  At the time he presented Malone's testimony, Harrington was not aware of any concerns by the Federal Government about Malone's methods or his prior testimony in cases.  (*Id*. at 73.)  Harrington said of the Malone testimony, "It was the most important factor in my thinking that Donald Gates killed C[ ] S[ ].  And that's the way I presented it to the jury."  (*Id*. at 76-77.)

The "deal" with Smith (under which he received dismissal of theft charges and payments) was made and likely ratified up the chain of command in the U.S. Attorney's Office at the grand jury stage, before Gates was indicted, and therefore before Harrington got involved in the case.  (*Id*. at 73, 77-78.)  Harrington met with Smith more than once before presenting his testimony at trial.  (*Id*. at 79.)  Harrington didn't like Smith.  (*Id*. at 80.)  In going over Smith's expected trial testimony, Harrington wanted to be sure it would be consistent with what he already testified to before the grand jury:  (*Id*. at 80; see also 294-295.)  Harrington had concerns about presenting Smith as a witness at trial.  Smith "was a person who would only testify publicly if he got these things, not just dismissal of cases, but money. . . . And my concern was that no matter how strong the rest of the case, that a D.C. jury would have a hard time convicting with that deal."  (*Id*. at 82.)

Smith had a record of criminal convictions.  (*Id*. at 92.)  In connection with his agreement with the Government, by the time of his grand jury testimony, Smith received dismissal of charges and payments of money.  (*Id*. at 89-90.)  Harrington acknowledged that a prosecutor's obligation to disclose exculpatory and impeachment material to the defense applied to witnesses, including their criminal convictions, money paid in consideration for providing information, and leniency on other charges, if that were the case.  (*Id*. at 20.)  Harrington would have provided that information in more general form to the defense before trial, but under the rules of criminal

16

procedure and his office policy, would not have disclosed the identity of the Government

witness, Smith, until trial.  (*Id*. at 52, 241-246.)  When asked if the detectives had additional

negative information about Smith, they should have passed it along to Harrington, he implied

that it would not have made a difference.  "This [Smith] is a snitch who is a nightcrawler, I

couldn't have had a lower opinion of him."  (*Id*. at 287.)

The prosecution presented Smith's testimony because it corroborated other evidence,

such as Malone's microscopic hair examination.  (*Id*. at 73, 171.)  Harrington would have

disclosed Smith's criminal record and the deal he had struck to the jury in jury selection, opening

statement and direct examination of Smith.  (*Id*. at 91.)  Nevertheless, Harrington invited the jury

to ignore Smith's testimony in closing (*Id*. at 179), presumably on the strength of the "other

crimes" and hair evidence.

Although Harrington had concerns about whether a jury would accept Smith's testimony

because of the agreement ("deal") he had struck with the Government, it did not occur to him

that Detectives Brooks or Taylor could have provided non-public details to Smith; assisted him

in fabricating a story ("put their thumb on the scale"); or suborned Smith's perjury if he

committed it.  (*Id*. at 83-86.)  He did not suspect that Detectives Brooks or Taylor had suborned

perjury; in fact, he ruled it out as a possibility.  (*Id*. at 85; see also 304-305, 317-320.)  If he had,

Harrington of course could not have used Smith, and would have reported it.  (*Id*. at 85.)  Nor did

Harrington recall that police misconduct or fabrication of Smith's testimony by the police was

ever a part of Gates' defense.  (*Id*. at 86-87.)

Gates was effectively represented by Hamilton ("Phil") Fox ("You bet.") (*Id*. at 83), who

made the case all about Smith (*Id*. at 177), presumably his credibility.  In presenting the

prosecution's case, Harrington was convinced that Gates was guilty of rape and murder beyond a

reasonable doubt.  "I was convinced Donald Gates did this crime. . .."  (*Id.* at 35, 94.)

> d.      The Issues on Appeal

Following post-trial motions, the Plaintiff appealed his conviction.  The decision is

reported as *Gates v. United States*, 481 A.2d 120 (D.C. 1984).

> 1)      Admission of the N.B. "Other Crimes" Evidence

Gates challenged the admission of the other crimes evidence involving the assault on

N.B. on June 3, 1981 in Rock Creek Park.  The Court of Appeals noted that the jury was

specifically instructed that the "other crimes evidence was admitted to show only intent, identity

or common plan or scheme, and not to show a predisposition toward criminal acts."  (*Id.* at 122.)

*See Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964).  The Court of Appeals found

"sufficient similarities" between the N.B. assault and the C.S. rape/murder:

> (1) the locations of the assaults were within a few hundred yards of each other, along the
> towpath, . . . (2) a nineteen day hiatus separated the crimes, . . . (3) both victims were
> white females in their twenties, . . . (4) record testimony [N.B.'s on the assault on her and
> Smith's on the assault on C.S.] revealed that both incidents began as robberies but turned
> into assaults, . . . [and] (5) at least nearby auto traffic was heavy at the time of the assaults
> evidencing boldness . . ..

(481 A.2d at 123-24.)  Those factors established a sufficient basis for a common plan or scheme

or identity.  (*Id.*)  The probative value of the evidence was not outweighed by the prejudicial

effect of its admission, where the trial court instructed the jury and the U.S. Attorney's Office

made clear in argument that the evidence was only admissible for only the prescribed, limited

purposes.  (*Id.* at 124.)  The trial court did not abuse its discretion in admitting the other crimes

evidence.  (*Id.*)

2)   <u>Exclusion of Evidence that Gates was Wrongly Identified by</u>
<u>Another Rape Victim</u>

Gates challenged another evidentiary ruling concerning other crimes evidence.  Gates had

wanted to introduce evidence regarding the J.F. incident in which he was wrongly accused of

rape.  The victim incorrectly identified Gates as the attacker.  The trial court ruled the evidence

inadmissible.  The Court of Appeals agreed.  (*Id.*)  On March 10, 1981, a woman was raped in

the Rock Creek Park area.  Shown a photo array, she identified Gates as her assailant.  After his

arrest, the charges were dropped when it was learned that he was incarcerated at the time of the

incident.  At the close of the U.S. Attorney's case, Gates' defense sought to introduce evidence,

through the police officer who did the photo array, regarding the identification of Gates.  Gates'

defense also proffered records showing that Gates was incarcerated at the time of the rape.

Gates' defense wanted to introduce the police testimony and jail records in order to argue that

Gates had a look-alike who was a rapist and to "blunt" the prejudicial effect of the N.B.

testimony with evidence that Gates was not the perpetrator of another similar crime.  (*Id.* at 124-

25.)  The trial court ruled the officer's testimony inadmissible hearsay as to the victim's

identification of Gates, and that the officer's testimony and jail records were insufficient to

establish similarities between the J.F. rape and the C.S. rape/murder, and thereby inferentially

excluded Gates.  (*Id.* at 125.)

On appeal, the Court of Appeals agreed.  There was not enough detail to argue identity,

common plan or any of the other crime categories to show that someone other than Gates

committed the C.S. rape/murder.  (*Id.*)  As to the challenge regarding the police officer's

testimony as inadmissible hearsay, Gates argued that, because another victim, J.S., misidentified

Gates, then Smith, the informant/witness, similarly misidentified Gates.  The hearsay exception

for identification did not apply.  The identification exception requires the identifier to be

available for trial for cross-examination.  The defense could not locate the victim of the March

10, 1981 rape.  Therefore, the evidence was properly excluded.  (*Id.*)

3) <u>Gates' Challenges to Serology Evidence</u>

Gates raised two challenges regarding the expert testimony given at trial.  At the scene of

the C.S. homicide, four serological swabs were taken from the victim's vagina.  Two were sent

to the FBI and two to the District's Medical Examiner.  The Gates defense called two expert

witnesses.  (*Id.*)  The first was Maureen Higgins, the FBI serology expert who performed the

tests on the two swabs that were sent to the FBI.  Her report was available to the Gates defense

and the U.S. Attorney's Office before trial.  In it, she said one swab was "inconclusive," meaning

that she could not reliably identify the blood groups involved.  The other swab showed only type

O blood group substances.  The victim had type O and Gates had type A.  Both were "secretors"

whose blood types could be determined by examination of bodily fluids; in Gates' case, through

his saliva.  (*Id.* at 125-26.)  The evidence was introduced to show that Gates was not the

depositor of the fluid.

The second expert, Dr. Walter Rowe, an associate professor of forensic sciences, on

direct examination discussed "scrambling," the changing of blood groups substances where

bacteria are introduced into body cavities.  (*Id.* at 126.)  On cross-examination by the prosecutor,

Rowe admitted that, if "scrambling" took place, some type A would get converted to type B.

(*Id.*)  He then testified that he was not aware that one of the swabs showed a weak positive for

type B blood type substances.  The Gates defense claimed surprise.  (*Id.*)

The prosecution recalled Higgins on rebuttal.  She explained that the "inconclusive"

finding on the first swab meant that there was a weak B type reading along with a strong type O

reaction.  In closing, the prosecutor argued that Rowe testified that bacterial activity would mask

a reading of type A blood group substances.  Gates' counsel objected and the trial court

instructed the jury that their recollection should control.  (*Id.* at 126-27.)

On appeal, the Gates defense argued that the U.S. Attorney's Office suppressed the

evidence regarding the weak B reading in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

The Court ruled that there was no *Brady* violation, because the defense had equal access to

Higgins' testimony, and, in fact, called her as their witness.  (*Id.* at 127.)  Further, the evidence

regarding the scrambling and weak B reaction was "inconclusive."  (*Id.*)  In other words, it was

not sufficiently probative of Gates' innocence to be material to the outcome of the case to have

violated *Brady*.  (*Id.*)  Finally, although the prosecutor could have more fairly argued the

scrambling evidence in closing argument, the trial court immediately administered a curative

instruction, so there was no error in that regard.  (*Id.*)

4)     Sufficiency of the Evidence Regarding Carrying a Pistol
       Without a License

Gates' last challenge concerned the sufficiency of the evidence regarding the weapon

used in the C.S. homicide.  Gates was convicted of carrying a pistol without a license, D.C. Code

§§ 22-3204.  The weapon used in the homicide was not recovered, and was referred to by

witnesses as a "revolver."  Although the D.C. Code § 22-2301(a) defined a "pistol" as a weapon

with a barrel of 12 inches or less, it was clear that witness testimony concerning a "revolver"

intended to include "pistol."  (*Id.* at 127-28.)

5)     Conviction Affirmed on Appeal

The Court of Appeals affirmed Gates' conviction.  (*Id.* at 128.)  Of the U.S. Attorney's

evidence against Gates at trial, only the other crimes evidence was an issue on appeal.  Neither

the hair analysis, nor the use and testimony of the informant/witness, Smith, were issues on

appeal.  There were no appellate issues claiming fabrication of evidence by police, *Brady*

21

violations with respect to the use of the informant, or a claim that suggestive identification procedures were used.  The jury found the evidence sufficient to convict Gates beyond a reasonable doubt.  The Court of Appeals ruled the conviction free of legal error.  Gates received a fair trial.

     e.  <u>Motions for New Trial</u>

  In August 1986, Gates moved for a new trial based upon newly-discovered evidence. The newly-discovered evidence was that two other young women who worked at the same law firm where C.S. had worked part time were also murdered.  (See <u>Ex</u>. #12, Memorandum Order, denying Motion for New Trial.)  By Memorandum Order dated March 10, 1987, Chief Judge Ugast of the D.C. Superior Court, who had also been the trial judge for the Gates trial, denied the defendant's motion for a new trial, noting that the government had presented fourteen (14) witnesses and stating:

> In considering a motion for new trial, the strength of the evidence presented by the government is important.  *United States v. Walus*, 616 F.2d 283, 288 (7th Cir. 1980).  **The government's key witness against the defendant was an informant, whose credibility was duly tested by defense counsel.  (Tr. Supplemental Record #2 at 3-72.)**  Also presented were expert witnesses and the friends and co-workers of the victim.  The government was allowed to introduce evidence of another crime committed by the defendant just nineteen days before the [S ] murder.  Defense counsel attempted to discredit the government's experts by presenting his own experts.  (Tr. at 321-431.)  No other defense witnesses were presented.  The defense presented no contrary evidence of where he was at the time of the murder.  The jury, which returned the guilty verdicts, chose to believe the government's witnesses.  This Court as well as the Court of Appeals found that there was sufficient evidence on which to base the convictions of the defendant.

(<u>Ex</u>. #12 at PDS 000288-289, n.4 (footnotes omitted, emphasis added).)

  On August 3, 1989, with the assistance of newly-appointed counsel, Gates filed a Petition for Writ of Error Coram Nobis, seeking new testing of biological evidence.  (<u>Ex</u>. #13, Government's Initial Response to Defendant's Application for Post-Conviction DNA Testing, at

4.)  Gates argued that, if the Court would permit new testing of the unknown hair follicle

recovered from the decedent shortly after the murder (which Agent Malone had relied on in his

testimony), the development of DNA testing would establish his innocence.  (*Id*.)  As further

support for his motion, Gates contended that the "essence of the defense in this case was, and

remains, that the serology evidence presented [at trial] demonstrates that an individual with a

blood type different from Gates committed the offenses."  (*Id*. at 5, quoting Gates' Petition at 4,

n.3.)  After DNA testing proved inconclusive, Gates withdrew his petition on September 12,

1990.  (*Id*. at 6.)

f.    <u>The Vacation of Gates' Conviction</u>

However, with advances in DNA testing, testing of vaginal swabs that had been

preserved at the D.C. Medical Examiner's Office showed that Gates was not the depositor of the

semen.  (<u>Ex</u>. #14, Government's Response to Defendant's Motion to Vacate Convictions.)

Because of subsequent developments, the U.S. Attorney's Office would no longer sponsor the

testimony of the FBI hair analyst.  (*Id*.)  The Federal Government therefore joined in the petition

to vacate Gates' convictions.  (<u>Ex</u>. #15, Government's Motion to Joint in Defendant Donald

Gates' Motion to Vacate Convictions.)  The District and the individual Defendants herein were

not parties to that proceeding.

After extensive depositions from the three former detective Defendants, Smith, Reverend

Harrington who prosecuted the Plaintiff at trial, and several other depositions, and thousands of

pages of discovery, there is no affirmative evidence to support the Plaintiff's contention that the

Defendants fabricated evidence that influenced the jury, suppressed material exculpatory and

impeaching evidence, and deliberately and improperly suggested defendant Smith's

23

identification of Gates, causing him to be deprived of his due process right to a fair trial. (Complaint, Count II.)

To defend Gates' civil case against the retired police Detectives and the District, the Defendants do not have to prove that he was actually guilty as charged.  "Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person."  *Baker v. McCollan*, 443 U.S. 137, 144 (1979).  It is the Plaintiff's burden to prove that he was deprived of his liberty by the wrongful acts of the Defendants.  He cannot meet that burden.

2.  Summary Judgment Standard, and the Requirement that the Plaintiff Adduce Affirmative Evidence to Create a Genuine Issue of Material Fact

Summary judgment must be granted when the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  While the party moving for summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact and the right to judgment as a matter of law, the burden shifts to the nonmoving party to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

A dispute of a material fact is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).  A fact in dispute is material if it may influence the outcome of the suit.  *Anderson*, 477 U.S. at 248.  If the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence

of an element essential to that party's case," then Rule 56(c) mandates that summary judgment must be granted. *Celotex*, 477 U.S. at 322.

"If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. The "plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id*. at 257.

For example, *Evans-Reid v. District of Columbia*, 930 A.2d 930 (D.C. 2007), involved the fatal shooting of a juvenile. While the officers' undisputed testimony and the physical evidence established that the juvenile had the gun in his hand when he was shot, the plaintiff's lawyer tried to discredit their testimony, and argued that the gun was planted after the fact. However, the D.C. Court of Appeals upheld the trial court's granting the defendants judgment as a matter of law at the close of the plaintiff's case. The court cited extensively to authorities and noted that casting doubt on the credibility of the defense witnesses was not enough to prove the contrary point as affirmative evidence, i.e., that the juvenile was unarmed and did not present a threat. *Id.* at 940-942.

"A plaintiff cannot create a genuine issue of material fact with speculative theories that are not supported by scientific evidence or witness testimony." *Cooper v. City of Rockford*, 2010 WL 3034181, *4 (N.D. Ill. Aug. 3, 2010). Disbelief of evidence does not demonstrate that an opposite inference can be made. *See, e.g., Group Hospitalization, Inc. v. D.C. Comm'n on Human Rights*, 380 A.2d 170, 174 (D.C.1977) (finding that "[m]ere disbelief of evidence is not a valid basis for inferring that the opposite is true). Similarly, disbelief in a witness' testimony does not supply evidence requisite to survive a motion for a directed verdict. *See Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 576 (1951) (disbelief of the witness' testimony "would not supply a want of proof"). In the absence of affirmative evidence "a verdict would

nevertheless have to be directed against" a plaintiff even if a jury disbelieved defendant's witness' testimony. *Dyer v. MacDougall*, 201 F.2d 265, 269 (1st Cir. 1953); *see also Martin v. Citibank, N.A.*, 762 F.2d 212, 217–18 (2d Cir. 1985) (finding no acceptable evidence of discrimination to defeat judgment as a matter of law); *Kenneth E. Curran, Inc. v. Salvucci*, 426 F.2d 920 (1st Cir. 1970) (finding that a lack of affirmative proof cannot overcome "evasive" or even "incredible" testimony).

In a criminal case, the prosecution has the burden of proving guilt beyond a reasonable doubt. The defense can prevail without putting on evidence, by merely attacking the prosecution's evidence. A civil case, such as this, is different. The Plaintiff has the burden of putting on affirmative evidence, and the failure to do so will result in judgment for the Defendants as a matter of law.

The Plaintiff alleges that the Defendants deprived him of a due process right to a fair trial through three courses of action: fabricating evidence, failing to disclose exculpatory and impeachment evidence to the prosecutor, and deliberately and improperly suggesting Defendant Smith's identification of the Plaintiff. (Complaint, ¶ 118; see also Complaint, ¶¶ 119-124.) On the record in this case, the Plaintiff cannot proffer affirmative evidence to support any of these claims. The Plaintiff has no source of affirmative evidence. Smith, who has no recollection of the case (Ex. #16, Gerald Smith dep. at107-108, 116-118, 125, 131,139,142, 226-227, 231), has never recanted his grand jury or trial testimony or alleged that it was coerced or suborned by the police detectives. There is no evidence that the detective Defendants were ever investigated administratively or criminally in connection with this case. And the Plaintiff cannot prevail by putting them on the witness stand, have them deny the Plaintiff's contentions and argue that their denials are lies.

Nor can Gates succeed with a third-tier inference; because he was erroneously convicted, the conviction must have hinged on the testimony of Smith; and Smith must have given false testimony; and the reason Smith gave false testimony must be that his testimony was suborned by the police.  Speculation does not create a genuine issue of material fact.  To overcome summary judgment, the Plaintiff must produce affirmative evidence in support of his claims. Merely attacking the credibility of the Defendants does not defeat the Defendants' right to judgment in their favor.

>    3.    Summary Judgment should be Granted in Favor of the Defendants on the Ground of Laches

The Defendants asserted the statute of limitations and/or laches as affirmative defenses in their Answer to the Complaint.  (Answer, Fourth Defense.)  An equitable doctrine, "[l]aches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Pro-Football, Inc. v. Hario*, 415 F.3d. 44, 48 (D.C. Cir. 2005), quoting *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131, 137 (D.C.Cir.1985).  This defense, which the Defendants have the burden of proving, "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  *Pro-Football, Inc.*, 415 F.3d. at 48, quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121-22 (2002) (internal quotation marks omitted); *see also Breen v. Tucker*, 821 F.Supp.2d 375, 380 (D.D.C. 2011).

The Defendants can show both prongs of that test.  First, the Plaintiff waited nearly thirty years to allege that the Defendants violated his Due Process right to a fair trial by fabricating evidence, failing to disclose exculpatory and impeachment evidence to the prosecutor, and deliberately and improperly suggesting Defendant Smith's identification of the Plaintiff.  Those allegations were never made at trial, in post-trial motions, the appeal or motions for a new trial.

The Plaintiff's contentions did not and do not depend upon subsequent advances in DNA testing or skepticism about the reliability of hair analysis.  There were no scientific barriers to Gates' investigating his claims at the time of his conviction.  If the Smith testimony was suspect, the Plaintiff could have investigated it at the time.  He could have produced the statements and affidavits he now relies on regarding Smith's credibility.  There is no newly-discovered evidence with respect to them that has emerged in the intervening years; there is just no evidence at all.  If there was police misconduct that was material to his conviction, Gates could have uncovered it at the time and sought the reversal of his conviction years before he did.

Gates may argue that he could not bring his § 1983 action until his conviction was overturned through DNA testing, but that argument is fallacious.  *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (damages claim that based on conduct whose unlawfulness would demonstrate invalidity of conviction or sentence is not cognizable unless conviction or sentence has been invalidated or called into question by issuance of writ of habeas corpus.)  Gates' conviction was overturned because his DNA did not match with DNA left on the victim and because the U.S. Attorney's Office would no longer sponsor the testimony of Malone, the microscopic hair analyst, and not because some witness, such as Smith, recanted his trial testimony, or because of newly discovered evidence that the police Defendants had actually manufactured evidence used to convict Gates.  The point is that Gates did not seek to overturn his conviction until there was a basis for it in the DNA evidence.  Because he can show that he was erroneously convicted, he speculates that he must have been wrongfully convicted because of police misconduct.  If that were the case, he could have demonstrated it decades ago.

Second, besides the Plaintiff's undue delay, there is extreme prejudice to the Defendants. The three former detective Defendants retired in the late-1980s after 20 years in the MPD and are

now in their mid-sixties.  While their knowledge of their involvement and the facts in the Gates

case would have been clear at the time, scores of other murder investigations and the passage of

more than 30 years have understandably affected their ability to recall details.  Smith, a

codefendant, has no memory of the case.  (Ex. 16 at107-108, 116-118, 125, 131,139,142, 226-

227, 231.)  In addition, through no fault of the individual former detective Defendants, the

underlying Gates trial transcript, the grand jury testimony, the prosecutors' files, the

investigative homicide file, and all the relevant physical evidence other the slides found in the

Medical Examiner's Office are unavailable and unaccounted for due to the passage of time.  The

absence of that documentary evidence prejudices the individual defendants.  Summary Judgment

should be granted in favor of the Defendants on the basis of laches.

> 4.   Summary Judgment should be Granted because the Plaintiff cannot Establish that he was Deprived of a Due Process Right to a Fair Trial (Count II).

>> a.   Plaintiff Must Prove Defendants Deprived Him of Liberty without Due Process.

Count II of the Complaint is brought against former Metropolitan Police Department

(MPD) detectives John Harlow, Norman Brooks, and Ronald Taylor.  (Complaint, ¶¶ 117-124.)

It alleges that the named Defendants violated the Plaintiff's due process right to a fair trial under

the Fifth and Fourteenth Amendments of the United States Constitution,  enforceable through 42

U.S.C. § 1983.  Specifically, the Plaintiff alleges that the Defendants fabricated evidence that

influenced the jury, suppressed material exculpatory and impeaching evidence, and deliberately

and improperly suggested defendant Gerald Smith's identification of the Plaintiff.  (Complaint, ¶

118; see also Complaint, ¶¶ 119-124.)

Section 1983 imposes liability on every official who "subjects, or causes to be subjected,

any citizen of the United States or other person within the jurisdiction thereof to the deprivation

of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

A § 1983 plaintiff must prove that a Defendant acted under color of law and deprived him of a

federal right. *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).  In this case, it is undisputed

that the former detective Defendants were acting under color of law.  However, they deny that

they deprived the Plaintiff of a federal right.  Because the District of Columbia is not a state, the

Fourteenth Amendment of the Constitution is not applicable, and the Due Process Clause of the

Fifth Amendment governs. *Bolling v. Sharpe*, 347 U.S. 497 (1954); *Rice v. District of Columbia*,

715 F.Supp.2d 127, 133 (D.D.C. 2010).

　　　Although Gates' complaint is for wrongful conviction, the Plaintiff has prepared it and

engaged in discovery as if it were a false arrest or negligent investigation case.  For example,

much of the deposition questioning in this case has centered on the then-existing *Aguilar-Spinelli*

test under which police obtaining a warrant based on information from an undisclosed,

confidential informant had to satisfy a two-prong test: first, an adequacy of knowledge test, that

there was an adequate basis for the confidential informant's knowledge; and second, a veracity

test, under which police seeking the warrant had to show that the informant was credible or

reliable. *Spinelli v. United States*, 393 U.S. 410 (1969); *Aguilar v. Texas*, 378 U.S. 108 (1964).

*Illinois v. Gates*, 462 U.S. 213 (1983), decided after the Plaintiff's arrest and trial, substituted a

"totality of the circumstances" test for the *Aguilar-Spinelli* test.

　　　This case is not about the affidavit in support of the warrant for Gates' arrest, which

described Smith as a witness, and relied on the witness's identification of Gates in a photo array

and the results of the FBI microscopic hair analysis of Gates' hair and hair found on the victim.

(Ex. #3.)  Smith was not, as is relevant to this case, a confidential informant.  Smith was a

witness, a person to whom Gates confessed to rape and murder, whose past happened to include

the fact that he had previously provided information to the police in exchange for money.  When the decision was made to present him as a witness, the central issue became the standards for sponsoring the testimony of a witness who had an impeachable background, not the use of a confidential informant in obtaining a warrant.

This is also not a negligent investigation or malicious prosecution case.  *Cf. Varner v. District of Columbia*, 891 A.2d 260, 274-77 (D.C. 2006) (public duty rule barred negligent investigation claim).  There is no constitutional right to an adequate investigation.  The Constitution does not require an officer to perform an error-free investigation, nor does it require officers to independently investigate every claim of innocence.  *Bibbins v. City of Baton Rouge*, 489 F.Supp.2d 562, 580 (M.D. La. 2007), citing *Baker v. McCollan*, 443 U.S. 137, 144 (1979) ("Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person."); *Newton v. City of New York*, 566 F.Supp.2d 256 (S.D.N.Y. 2008) (no constitutional right to an adequate investigation), citing *Campbell v. Guiliani*, 2000 WL 194815, at *3 n.6 (E.D.N.Y. Feb. 16, 2000) ("[I]n the context of § 1983, allegations of officers' failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution."); *Henriksen v. Picardi*, 2006 WL 299071, *11 (N.D. Ill. Feb. 07, 2006) (no due process right to full and complete police investigation). There are no false imprisonment, false arrest, or malicious prosecution claims in this case.

While the Plaintiff has repeatedly emphasized that the detectives should have gone to the park where Smith met with Gates to find witnesses who saw the two together, a negligent, even reckless, investigation is not in itself actionable; it is only actionable if it causes a deprivation of liberty through an unfair trial.  The violation does not occur unless the alleged misconduct causes the deprivation.  *Whitlock v. Brueggermann*, 682 F.3d 567, 585 (7th Cir. 2012) (reckless

investigation alone not actionable; violation occurs only when plaintiff deprived of liberty); *Zahrey v. Coffee*, 221 F.3d 342 (2d Cir. 2000) (manufacture of false evidence in and of itself does not impair liberty; rather, there must be an attendant deprivation of liberty).

Generally, government misconduct affecting the fairness of a criminal trial is evaluated under the standards of procedural due process. *Fields v. City of Chicago*, 805 F.Supp,2d 536, 543 (N.D. Ill. 2011), citing *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (allegations that defendant officers withheld materials exculpatory evidence at trial state a procedural due process claim cognizable under section 1983). Jurisdictions treating due process violations as substantive require evidence of a culpable state of mind ("deliberate indifference") and consequences that are "conscience shocking." *E.g. Winslow v. Smith*, 696 F.3d 716, 734-35 (8th Cir. 2012); *Whitley v. Allegheny County*, 2010 WL 892207 (W.D. Pa. Mar. 9, 2010). Even if this jurisdiction recognized substantive due process violations in a similar situation, the Plaintiff could not show that the Defendants' conduct was "deliberately indifferent" to his due process rights or "conscience shocking."

1)      <u>Fabrication of evidence</u>

A police officer's fabrication of evidence violates a criminal defendant's due process right to a fair trial if (but only if) it is later used at trial to obtain the defendant's conviction. "The manufacturing of evidence and the state's use of that evidence ... to obtain [the defendant's] wrongful conviction undisputably denie[s] him [of] rights secured by the Due Process Clause." *Castellano v.Fragozo*, 352 F.3d 939, 955 (5th Cir.2003); *Young v. Biggers*, 938 F.2d 565, 570 (5th Cir.1991) (holding that a police officer's fabrication of evidence against an innocent defendant violates a clearly established constitutional right to due process). "The Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false

evidence." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The Supreme Court in *Napue* stated that

"implicit in any concept of ordered liberty," is a right to not be deliberately subjected to trial

based on "false evidence." *Id.*; *see also Mooney v. Holohan*, 294 U.S. 103, 112 (1935);

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir.2005); *Pierce v. Gilchrist*, 359 F.3d 1279 (10th

Cir.2004); *Bibbins v. City of Baton Rouge*, 489 F.Supp.2d 562, 572, 576 (M.D. La. 2007).

 The fabricated evidence must have actually been used at trial and it must have caused the

criminal defendant's conviction.  In *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir.2000), the Court of

Appeals for the Second Circuit noted that "[t]he manufacture of false evidence, 'in and of itself,'

... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right."

*Id.* at 348.  Rather, a constitutional claim cannot be limited to the act of falsifying evidence, but

there also must be an attendant deprivation of liberty:

> But [the plaintiff]'s claim, though premised on the manufacture of false evidence, is not limited to that act.  Rather, he alleges an example of a classic constitutional violation: the deprivation of his liberty without due process of law.  The liberty deprivation is the eight months he was confined, from his bail revocation (after his arrest) to his acquittal, and the due process violation is the manufacture of false evidence.  The complaint alleges that the deprivation of the liberty interest was the result of the due process violation.

*Id.*

 False evidence only violates a criminal defendant's due process rights if it is "used to

deprive the defendant of her liberty in some way."  *See Whitlock v. Brueggemann*, 682 F.3d 567,

580 (7th Cir. 2012).  Indeed, "if an officer . . . fabricates evidence and puts that fabricated

evidence in a drawer, making no further use of it, then the officer has not violated due process;

the action did not cause an infringement of anyone's liberty interest."  *Id.* at 582.

 In this case, the false evidence claim is extremely limited.  The Plaintiff makes no claim

that the former homicide detective Defendants fabricated the N.B. incident, hair analysis or even

the Smith narrative.  It is undisputed that Smith went to his contact, Lieutenant Harlow, claiming

information about a murder, before Smith was known to Detectives Brooks and Taylor, and that, at the time of the initial contact, Lieutenant Harlow had no knowledge that Detectives Brooks and Taylor were investigating a homicide near Rock Creek Park.  (Ex. #17, Declaration of John C. Harlow, at 2-3; Ex. #19, Declaration of Norman D. Brooks, at 2; Ex. #21, Declaration of Ronald S. Taylor, at 2.)  There are no allegations and no evidence that Detectives Brooks and/or Taylor manufactured Smith's account of his encounter with Gates, e.g., that a man he drank with in the park told him he had committed a rape/murder.  The only claim is that Detectives Brooks and/or Taylor gave Smith two non-public details in order to bolster Smith's credibility: first, that the man he drank with in the park told him the rape/murder started as a robbery; and second, that he knew both Gates' first and last names.  (See, e.g., Complaint, ¶ 40; see also ¶ 119.)

Neither Detectives Brooks nor Taylor agrees that the crime they were investigating started as a robbery.  (Ex. #19 at 2; see also Ex. # 20 at 194 (but cannot say robbery was discounted as a motive); Ex. #21, at 2; Ex. #22, at 387 (criminal assault and rape), 389 (sexual assault and murder), 427 (information that robbery was motive came from Smith).)  For example, the perpetrator left the victim's purse with money in it behind.  More significantly, the jury obviously did not accept Smith's testimony in that regard; they found Gates not guilty of attempted robbery.  (Ex. #9, at 2.)  Even if, contrary to the undisputed evidence, Detectives Brooks and/or Taylor had fed the "it started as a robbery" detail to Smith, it was not material to Gates' conviction on other charges.

The other non-public detail that Detectives Brooks and/or Taylor supposedly provided to Smith was Gates' full name.  Citing to court filings that say that Gates was already a suspect when Smith went to Lieutenant Harlow with information about the C.S. crime a week later (Ex. # 20 at 183-183, citing deposition Ex. 3; Ex. #21, at 2; Ex. #22, at 237, 244, 249), the Plaintiff

asserts that Detectives Brooks and/or Taylor provided the name Donald Gates to Smith, rather than Smith providing it to the detectives.  (See, e.g., Complaint, ¶ 40; see also ¶ 119.)  The appellate brief filed by the government, however, says the "first significant lead" in the case occurred when Smith went to Lieutenant Harlow with information a week later.  (Ex. #1, at 6.)  While Gates had been arrested in the N.B. assault about three weeks before, that was not a crime that would have been investigated by the homicide detectives when it occurred or would have been known to the homicide detectives within a week of the C.S. rape/murder.  (Ex. #19 at 2; Ex. #21, at 2.)  Likewise, the J.F. rape could not have been known to the homicide detectives at the time Smith came forward, because it was a crime investigated by the U.S. Park Police and Gates was not arrested until late July.  (Ex. 2.)

Accordingly, Detectives Brooks and Taylor dispute the allegation that Gates was already a suspect when Smith came forward with information.  (Ex. #19 at 2; see also Ex. # 20 at 183 (did not recall), 187 (did not know anything about Gates), 211 (did not prepare court documents saying Gates was already a suspect).)  Ex. #21, at 2; Ex. #22, at 244 (does not know if correct), 249 (does not know if Gates was suspect when Smith came forward), 482 (does not agree with statements in briefs).  Right after Smith's conversation in the park with Gates, Smith phoned Lieutenant John Harlow of the robbery squad to check out the authenticity of Gates' story and to obtain some money in return for the information.  (Ex. #1 at 7.)  A few days later, Smith spoke again with Harlow, who gave him the names of Detectives Brooks and Taylor from the Homicide Branch.  (Id.)  Smith was initially paid $50 and not asked to do anything at that point.  He subsequently received another $250, and agreed to notify the police the next time he saw Gates.  (Id., n.8.)  Smith provided Gates' full name to Detective Taylor, who pulled Gates' mug shot from police files (Ex. #22 at 4), and, according to the government's appellate brief,

identified Gates in August 1981 as the man who confessed to him.  (Ex. #1 at 7.)  The sequence

of events provides evidence that Smith knew Gates' identity before identifying him in a photo

array.

However, assuming solely for the purposes of summary judgment, that Gates was already

known to the detectives and considered a suspect before Smith came forward with information

about his conversation with Gates, that would not affect the detectives' denials that they

provided Gates' name to Smith.  Even if, contrary to the uncontested facts, Smith did not know

Gates' name, he nevertheless picked him out in a photo array as the man who had confessed to

him.  (Id.; Ex. #3)

Thus, the Plaintiff's fabrication of evidence claim fails.

2)      Suppression of material exculpatory and impeachment evidence

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme Court held that the

suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or punishment.  In United States v. Agurs,

the Court held that the duty to disclose is affirmative: the government must turn over material

exculpatory evidence even when the defense has failed to request it. 427 U.S. 97, 108 (1976).  In

United States v. Bagley, 473 U.S. 667, 676 (1985), which was decided three years after the Gates

trial, the Court extended the Brady rule to impeachment evidence as well as to direct evidence of

guilt.  Exculpatory evidence includes evidence that might be used to impeach the credibility of a

witness, such as evidence of bias where a witness has been paid or provided with benefits by the

government in connection with his testimony. Id. at 676.  In Kyles v. Whitley, which was decided

thirteen years after the Gates trial, the Court held that the Brady disclosure obligation extends to

evidence known only to police officers, but that the responsibility for obtaining and disclosing

such evidence remains the duty of the prosecutor, and not the police officer. 514 U.S. 419, 437–38 (1995) (holding that *Brady's* duty encompasses evidence "known only to police investigators and not to the prosecutor").

Brady violations implicate a defendant's right to a fair trial. *Orange v. Burge*, 2008 WL 4443280, *11 (N.D. Ill. Sept. 29, 2008), citing *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir.2001). Because a *Brady* violation deprives the accused of his or her constitutional rights, it can form the foundation of a § 1983 claim. *Orange*, 2008 WL 4443280, at *11, citing *Rodriguez v. Woodall*, 2004 WL 2583883, at *3 (N.D.Ill. Nov.12, 2004) (Kennelly, J.).

To prove a *Brady* violation, a plaintiff must establish that: (1) the evidence at issue must be favorable to the accused, meaning either exculpatory or impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice. *Orange*, 2008 WL 4443280, at *11, citing *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir.2002), citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The determinative question is whether the evidence was material; that is, whether there is a reasonable probability that, had the evidence been disclosed to the defendant, the result of the proceeding would have been different. *Wilson v. Whitley*, 28 F.3d 433, 434 (5th Cir.1994), citing *Bagley*, 473 U.S. at 682. A reasonable probability is one sufficient to undermine confidence in the outcome. *Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir. 1996), citing *Bagley*, 413 U.S. at 682. In determining whether there is a reasonable probability that the outcome of the trial would have been different, the court's focus is whether the withheld evidence contains information that could have been used, on cross-examination, to significantly undermine the witness's credibility.

37

*Id.* at 675-76.  The materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence introduced by the state.  *Wilson*, 28 F.3d at 439.

When evaluating a claim of impeachment evidence withheld in violation of *Brady*, the court must consider the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed testimony.  *Beaman v. Souk*, 2011 WL 832506, *7 (C.D. Ill March 3, 2011); *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir.1989).  Impeachment evidence that is merely cumulative does not raise a reasonable probability of a different result at trial.  *United States v. Dumas*, 207 F.3d 11, 16 (1st Cir. 2000) ("Impeachment evidence, even that which tends to further undermine the credibility of the key government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not otherwise exist where that evidence is cumulative or collateral."); *Andrews v. Collins*, 21 F.3d 612, 626 & n. 29 (5th Cir. 1994) (cumulative testimony not material for purposes of *Brady*).  Suppressed evidence of incremental impeachment value does not raise a reasonable probability of a different result at trial.  *See Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir.2005); *Drew v. Collins*, 964 F.2d 411, 419–20 (5th Cir.1992).

There was no *Brady* violation in this case.  The defense before trial and the jury at trial were informed about Smith's prior criminal record, the money he received and the charges that were being dropped for providing information.  Smith admitted on the stand that he had been convicted of unlawful possession of stolen mail (1971), armed robbery (1972), possession of an unregistered firearm (1975), and false pretenses (1975).  (*Id.*, at 6, n.7.)  There was trial testimony that Smith, who had been reporting information to the police for pay, received $50 and later $250 from the police for providing information about his conversation with Gates, and

subsequently received $1,000 from Crime Solvers after testifying before the grand jury about his conversation with Donald Gates." (*Id.*, at 7, n.8.)  The jury also heard testimony that, in exchange for his cooperation with police, Smith received leniency on some pending charges: three shoplifting charges in Maryland and a larceny after trust case in the District of Columbia. (*Id.*)  Those disclosures fully satisfied the *Brady* obligation.

In discovery, the Plaintiff has claimed that the Defendants failed to make two *Brady* disclosures.  First, Louis Hennessey was an investigator with the homicide department, who arrested Smith on the possession of an unregistered firearm charge.  (See Ex. #23, Declaration of Louis Hennessey.)  He supposedly told Detective Taylor that Smith should not be trusted.  While Detective Taylor does not agree that such a conversation took place ( Ex. #21, at 5-6; Ex. #22, at 279, 465,) assuming solely for the purpose of the Motion for Summary Judgment, that the conversation did take place, Hennessey's negative opinion of the person he arrested would be cumulative under *Brady*.  Smith's criminal record, which contained impeachable convictions, and his motive to lie based upon monetary consideration and leniency on charges was already disclosed.  Moreover, there was also strong evidence of Gates' guilt apart from the Smith testimony.  Gates committed another crime in the same location three weeks before and a perpetrator whose pubic hair was a microscopic match with his committed the C.S. rape/murder.

Second, the *Brady* disclosures included the fact that the U.S. Attorney's Office had dismissed a theft after trust charge against Smith in consideration for his cooperation with the police.  Specifically, the charge allegedly related to Smith's retained $400 in police money that he was supposed to use to make a controlled drug buy.  (Ex. #24, Declaration of Charles Baird.) The defense and the jury already heard that three shoplifting charges in addition to the theft after trust charge against Smith were dropped, an agreement evidently reached at the time of his grand

jury testimony.  (Ex. #11 at 73, 77-78 (agreement with Smith made at grand jury stage).)  Since the homicide detectives did not make controlled drug buys, there is no reason they knew about the facts and circumstances of that arrest.  Although taking drug buy money could disqualify Smith from making future controlled drug buys, even if that was known to the homicide detectives, it would not negate the fact that Smith had information about a rape/murder.

Regardless, by the time the case went to grand jury the theft after trust charge was known and the government was willing to dismiss it to secure Smith's grand jury and trial testimony. Although there is evidence that Hamilton Fox cross-examined Smith at length (E.g., Ex. #12 at PDS 000288-289, n.4.), there was nothing to prevent him from inquiring about the details of that charge or any other charge, or to request a continuance of the Gates trial if he claimed prejudice.

As it stands, the details of Smith's convictions or the charges that were dismissed would be merely cumulative and not material to Gates' conviction.  The failure to disclose Hennessey's opinion of Smith or the fact that the dismissed theft after trust charge involved taking police buy money, if that occurred, is merely cumulative and incremental; did not undermine confidence in the Gates conviction, which would have occurred regardless, and was not a due process violation.  The Court should so rule as a matter of law.

### 3)   Suggestive identification

Flawed identification procedures are not themselves constitutional violations; the Plaintiff must show how those flawed procedures violated his constitutional right to a fair trial. *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir.2006); *Henriksen v. Picardi*, 2006 WL 299071, *11 (N.D. Ill. Feb. 7, 2006):

The Supreme Court has held that the determination as to whether a criminal defendant's due process rights were violated by the admission of evidence at trial derived from unnecessarily

suggestive identification procedures depends upon the totality of the circumstances surrounding those procedures. *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314 (1987). In *Manson v. Brathwaite*, 432 U.S. 98 (1977), the Court described the standard under the Due Process Clause as one of fairness, and identified the interest protected in *Stovall* as evidentiary. *Manson*, 432 U.S. at 113. The Court noted that "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest," *id*. at 113 n. 13, and held that "reliability is the linchpin" in determining the admissibility of such identification testimony, *id*. at 114. In assessing the reliability of an identification and evaluating whether there exists a high likelihood of misidentification, a number of factors should be considered. *Id*., citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972). These factors "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Id*. This analysis is in turn determinative of whether the evidence should be permitted to go to the jury. *See Biggers*, 409 U.S. at 201. Both *Stovall* and *Manson* reflect "the concern that the *jury* not hear eyewitness testimony unless that evidence has aspects of reliability." *Manson*, 432 U.S. at 112 (emphasis added).

"Suggestive procedures are disapproved 'because they increase the likelihood of misidentification,' and it is the admission of testimony carrying such a 'likelihood of misidentification which violates a defendant's right to due process.'" *Newton v. City of New York*, 566 F.Supp.2d 256, 272 (S.D.N.Y. 2008), quoting *Wray v. Johnson*, 202 F.3d 515, 524 (2d Cir.2000) quoting *Biggers*, 409 U.S. at 198. Several circuits have read *Stovall* and *Manson* to mean that, in the context of unduly suggestive lineups, no due process violation occurs unless a

defendant's right to a fair trial is impaired.  *See Hernandez v. Terrones*, 397 Fed.Appx 954, 969

(5th Cir. 2010); *Pace v. City of Des Moines*, 201 F.3d 1050, 1055 (8th Cir.2000); *Hensley v.

Carey*, 818 F.2d 646, 649 (7th Cir.1987); *Antonio v. Moore*, 174 Fed.Appx. 131, 135–36 (4th

Cir.2006).

        Although Detective Taylor did not have a specific recollection of Smith's identification

of Gates, both he and Detective Brooks testified that their standard methodology would have

been to obtain a photograph of Gates from the MPD Identification and Records Department,

create a photo spread of approximately 10 individuals and to ask the subject whether the person

he is talking about is among those in the photo array.  (Ex. #19 at 3; see also Ex. # 20 at 126-128,

213-215; Ex. #21, at 3-5; see also Ex. #22, at 200, 205, 380, 384, 467-468, 471.)  Smith knew

Gates from his conversations with him and identified Gates with 100 per cent certainty.  (Cf. Ex.

#3; Ex. #1 at 8.)

        The Gates defense filed a motion to suppress the photo identification on the ground that

at least the procedure was unduly suggestive, which the U.S. Attorney's Office opposed.  (Ex.

#7, Motion to Suppress and Opposition.)  The trial court denied the Motion to Suppress (Ex. #8),

and testimony regarding Smith's identification of Gates was admitted at trial.  (Ex. #1 at 8.)   The

Gates defense did not raise the issue of the suggestiveness of the identification in post-trial or

appellate briefs.  The issue was fully litigated and, since the Plaintiff has taken the position that

the alleged false identification was necessary to the outcome of the criminal trial, its re-litigation

is precluded under collateral estoppel.  *Fenwick v. United States*, 2013 WL 772882, *5 (D.D.C.

Mar. 1, 2013) (collateral estoppel "precludes the relitigation of issues actually litigated and

necessary to the outcome of a prior case involving the party against whom estoppel is asserted . .

..").

In sum, the Plaintiff must demonstrate that the alleged wrongful acts of the Defendants deprived him of liberty through an unfair trial.  He cannot demonstrate that the Defendants fabricated evidence.  The *Brady* disclosure requirements were fully satisfied.  And Gates' due process rights were not violated by an unduly suggestive identification procedure.

     5.     <u>Summary Judgment should be Granted in Favor of the Individual Defendants on the Merits or on the Basis of Qualified Immunity (Counts II-IV).</u>

     a.     <u>The John Doe Defendants should be Dismissed</u>

The Plaintiff's Complaint names Police Officer "John Doe(s)" as defendants. (Complaint, ¶ 113.)

Under federal law, the use of unnamed, "John Doe" defendants will not be permitted if ignorance of the defendants' identities is a result of the lack of reasonable inquiry.  See Fed. R. Civ. P. 10(a) (title of complaint shall include names of all parties).  While a plaintiff may bring an action against fictitious defendants at a time when their actual identifies are unknown, John Doe defendants should be dismissed from the action once the plaintiff learns their identities; they cannot remain as defendants after the close of discovery.  *See Buruca v. District of Columbia*, 902 F.Supp.2d 75, 79 (D.D.C. 2012); *Simmons v. District of Columbia*, 750 F.Supp.2d 43 (D.D.C. 2011); *Saffron v. Wilson*, 70 F.R.D. 51 (D.D.C. 1975); *Maurice Gross v. District of Columbia*, 734 A.2d 1077 (D.C. 1999) (Super. Ct. R. 4(m) mandates dismissal of unnamed, unserved officers).

The John Doe defendants should be dismissed.

     b.     <u>The Standard for Qualified Immunity</u>

Lieutenant Harlow, Detective Brooks and Detective Taylor seek summary judgment on the merits or the due process claims against them, or in the alternative, qualified immunity.  The individual Defendants have raised the qualified immunity defense.  (Answer to Complaint, Ninth

Defense.)  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Shaw v. District of Columbia*, 2013 WL 1943032, *4 (D.D.C. May 13, 2013).  As formulated by the Supreme Court, the two pertinent questions in determining whether qualified immunity applies are (1) "whether a constitutional right would have been violated on the facts alleged," and (2) "whether the right was clearly established" at the time of the violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "'Clearly established' for purposes of qualified immunity means that 'the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right.'"  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Wilson v. Layne*, 526 U.S. 603, 614–15 (1999).  The inquiry as to whether a right is "clearly established" "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Wilson*, 526 U.S. at 615 ("the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established"); *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2084 (2011) (what is "clearly established" is not to be defined at a "high level of generality").  However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has been previously held unlawful."  *Wilson*, 526 U.S. at 615.  Officials can be on notice that their conduct violates established law even in "novel factual circumstances," and there is no requirement that previous cases be "fundamentally similar."  *Shaw*, 2013 WL 1943032, at *4, quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

As of the Gates investigation in 1981 and trial in 1982, it was not clearly established that Gates could prove a due process violation without showing that pre-trial conduct or omissions of the Defendants actually deprived him of liberty through his conviction. *See, e.g., Zahrey v. Coffey, supra.* It was not clearly established that a witness with an impeachable background who was giving trial testimony had to be vetted under the *Aguilar-Spinelli* test as if he were a confidential informant supporting issuance of a warrant. It was not clearly established in 1981 and 1982 that police officers had a duty to provide exculpatory and impeachment materials to prosecutors. *See, e.g., Kyles v. Whitley, supra.* It was not clearly established that police officers had a duty to make inquiries of other officers to determine whether those officers had information about or experience with an informant who was going to testify as a witness. Nor was it clearly established that a police officer violated a criminal defendant's due process right to a fair trial, if the police officer failed to provide exculpatory and impeachment material about a witness, when the prosecutor acquired that information on his own and disclosed it to the defense at the time of trial. *See, e.g., Kyles v. Whitley.*

In 1981 and 1982, the law was not clearly established regarding pre-indictment photo arrays. *See, e.g., Stovall v. Denno, supra; Manson v. Braithwaite, supra.* A suggestive photo array by itself cannot violate due process, if the Court rules, after hearing, that the identification was not suggestive, as occurred in this case. (Ex. #8.)

Reasonable police officers in the place of Lieutenant Harlow, Detective Brooks and Detective Taylor would not have believed they violated the Plaintiff's clearly-established due process rights.

      c.       <u>Summary Judgment/Qualified Immunity for Lieutenant John Harlow</u>

Former Lieutenant John Harlow did not violate the Plaintiff's due process rights to a fair trial and/or he is entitled to qualified immunity.  Lieutenant Harlow served in the MPD from 1969 to 1989.  (<u>Ex</u>. #17, Declaration of John C. Harlow at 1; see also <u>Ex</u>. # 18, Deposition of John C. Harlow at 13.)  As a lieutenant in robbery, he knew Gerald Smith, whom he called "Bear."  (<u>Ex</u>. #17 at 2; see also <u>Ex</u>. # 18 at 54.)  Smith provided useful information to Lieutenant Harlow in several robbery cases.  (<u>Ex</u>. #17 at 2; see also <u>Ex</u>. # 18 at 226.)  Lieutenant Harlow did not know anything that would disqualify Smith from providing information in connection with a murder investigation.  (<u>Ex</u>. #17 at 2; see also <u>Ex</u>. # 18 at 269.)

Smith called Lieutenant Harlow and asked if they, the MPD, had a murder in Rock Creek Park.  Lieutenant Harlow contacted homicide and found out that Detectives Brooks and Taylor had such a case.  He put the Detectives in touch with Smith.  (<u>Ex</u>. #17 at 2-3; see also <u>Ex</u>. # 18 at 192, 233-246, 250-251.)  It is undisputed that Smith initiated the contact with Lieutenant Harlow; that Donald Gates and details about the murder were unknown to Lieutenant Harlow; and that he did not provide Smith with the name Donald Gates, or any information about the murder.  (<u>Ex</u>. #17 at 3; see also <u>Ex</u>. # 18 at 270-271 (did not provide Smith with Gates' first and last names or that it began as a robbery).)

Lieutenant Harlow did not know that Smith had been an informant for other units in the MPD.  (<u>Ex</u>. #17 at 3; see also <u>Ex</u>. # 18 at 257 (not aware that Smith provided information in other homicide cases).)  Lieutenant Harlow did not know of Donald Gates.  (<u>Ex</u>. #17 at 3; see also <u>Ex</u>. # 18 at 226.)

Lieutenant Harlow was not involved in the investigation of the C.S. rape/murder (<u>Ex</u>. # 18 at 124); was not involved in the prosecutor's decision to dismiss criminal charges against

Smith in other cases; did not arrange for Smith to receive dismissal of charges in connection with his willingness to provide  testimony; did not contact prosecutors and was not contacted by prosecutors about Smith (Ex. # 18 at 191); did not participate in the photo array in which Smith identified Gates; did not testify at the grand jury or trial (Ex. # 18 at 133); and made no decisions about what evidence would be introduced in the criminal proceedings against Gates.  (Ex. #17 at 3-4.)

Lieutenant Harlow denies any knowledge that Detectives Brooks and/or Taylor provided Gates' full name or other details about the crime to Smith to bolster his testimony; that Detectives Brooks and/or Taylor failed to call prosecutors' attention to negative information, if they knew any, about Smith's trustworthiness; or that Detectives Brooks and/or Taylor suggested Smith pick out Gates in a photo array.  (Ex. #17 at 3-4.)  Lieutenant Harlow was not aware of misconduct of any kind by Detective Brooks and/or Detective Taylor concerning this case and knows that, if he had been, he would have had a duty to report it.  (Ex. #17 at 4; see also Ex. # 18 at 269 (Detectives Taylor and Brooks above reproach.)

On these uncontested facts, Lieutenant Harlow did not violate the Plaintiff's due process right to a fair trial and/or is entitled to qualified immunity because a reasonable police officer in his position at the time would not have known he was violating clearly established due process rights.

### d.      Summary Judgment/Qualified Immunity for Detective Norman Brooks

Former Detective Norman Brooks did not violate the Plaintiff's due process rights to a fair trial and/or he is entitled to qualified immunity.  Detective Brooks joined the Metropolitan Police Department in 1969 and retired from it in 1989.  (Ex. #19 at 1; see also Ex. # 20 at 11, 39.)  Detective Brooks along with Detective Taylor was assigned the C.S. rape, murder case.  He

went to the scene, observed the Mobile Crime unit gather evidence, and began to interview

witnesses.  (Ex. #19 at 2.)  Donald Gates was not an individual known to Detective Brooks at the

time of the initial C.S. investigation, and, therefore, he was not a suspect at the time Gerald

Smith (known as "Bear") went to Lieutenant Harlow with information about the crime.  (Ex. #19

at 2; see also Ex. # 20 at 183 (did not recall), 187 (did not know anything about Gates), 211 (did

not prepare court documents saying Gates was already a suspect).)

Within a short time of the C.S. rape, murder Lieutenant Harlow introduced Smith to

Detectives Brooks and Taylor.  (Ex. #19 at 2; see also Ex. # 20 at 129, 154.)  Detective Brooks

had no prior information about Smith, but Lieutenant Harlow said he had been an informant in

robbery cases.  (Ex. #19 at 2.)  After an initial meeting at the homicide office, Smith returned at

least one other time, when he was supposed to provide additional information about Gates,

including to the best of Detective Brooks' recollection, whether he owned a gun.  (Ex. #19 at 2;

see also Ex. # 20 at 156.)  Neither Detective Brooks, nor Detective Taylor in his presence,

provided any information about the murder to Smith, including the name Donald Gates, nor the

idea that the murder began as a robbery.  (Ex. #19 at 3; see also Ex. # 20 at 216-217.)

Detective Brooks was not present when Detective Taylor conducted the photo array at

which Smith identified Gates as the man in the park who had confessed murder to him.  (Ex. #19

at 3.)  Nor did Detective Brooks participate in preparing the warrant for Gates' arrest.  (Ex. #19

at 3.)  At the time he was investigating the C.S. murder, Detective Brooks was unaware that

Smith was reportedly an informant in other homicide cases (Ex. # 20 at 212), if in fact he was,

and he was unaware that Smith had been used in a controlled narcotics buy in which he went off

with the buy money, if in fact the incident occurred.  (Ex. #19 at 4.)  Detective Brooks had no

knowledge of any discussion that a then-homicide investigator named Hennessey allegedly had with Detective Taylor.  (Ex. #19 at 4.)

Detective Brooks did not participate in obtaining payments to Smith or the government's decision to drop three shoplifting and a theft after trust charge in exchange for Smith's agreeing to testify before the grand jury.  (Ex. #19 at 4.)  Detective Brooks was aware of the responsibility of detectives in his position to turn over to prosecutors information that would be favorable to the criminal defendant.  The homicide files contained, among other things, evidence reports, a running resume, witness statements and summaries of interviews, and notes detectives kept in their notebooks.  Detective Brooks discharged his obligation to provide information about the accused and witnesses by making his entire file available to the prosecutor, and meeting with him or her.  (Ex. #19 at 4; see also Ex. # 20 at 97 (case jacket with everything to Assistant U. S. Attorney), 136 (aware of obligation to turn over *Brady* material to prosecutor).)

Detective Brooks did not testify before the grand jury or at trial.  (Ex. # 20 at 153, 218.) The prosecutor decided what information to provide to Gates' defense counsel and the jury about Smith and whether to sponsor his testimony as a witness.  (Ex. #19 at 5.)  Detective Brooks played no role in the decision about what other evidence to present or exclude at trial.  (Ex. #19 at 5.)

Detective Brooks had no knowledge of the Plaintiff's claims that Detective Taylor and/or Lieutenant Harlow provided Gates' full name or other details about the crime to Smith to bolster his testimony; that Detective Taylor and/or Lieutenant Harlow failed to call prosecutors' attention to negative information, if any, they had about Smith's trustworthiness; or that Detective Taylor suggested Smith pick out Gates in a photo array.  (Ex. #19 at 5.)  Detective Brooks was not aware of misconduct of any kind by Detective Taylor and/or Lieutenant Harlow

concerning this case and knows that, if he had been, he would have had a duty to report it.  (Ex. #19 at 5.)

On these uncontested facts, Detective Brooks did not violate the Plaintiff's due process right to a fair trial and/or is entitled to qualified immunity because a reasonable police officer in his position at the time would not have known he was violating clearly established due process rights.

e.     Summary Judgment/Qualified Immunity for Detective Ronald S. Taylor

Former Detective Ronald Taylor did not violate the Plaintiff's due process rights to a fair trial and/or he is entitled to qualified immunity.  Detective Taylor joined the police department in 1969 and retired from it in 1989.  (Ex. #21, at 2; Ex. #22, at 13.)  Detective Brooks and he were assigned the Schilling case.  He investigated it as a criminal assault, rape, and murder case, not as an attempted robbery.  (Ex. #21, at 2; Ex. #22, at 387, 389.)  Detective Taylor had not heard of Donald Gates and Gates was not already a suspect in the C.S. case at the time Gerald Smith came to them with information.  (Ex. #21, at 2; Ex. #22, at 237, 244, 249.)

Detective Taylor had no knowledge of Smith before Smith went to Lieutenant Harlow saying he had information about a murder.  (Ex. #21, at 2.)  Detective Taylor had several meetings with Smith at the homicide office.  (Ex. #21, at 3; see also Ex. #22, at 139, 401-416.)  Detective Taylor provided no information to Smith at all about the C.S. crime, and specifically denies that he provided the name Donald Gates or that the rape, murder began as a robbery.  (Ex. #21 at 3.)  The name Donald Gates came from Smith (Ex. #22 at 296, 374), as did the statement that Gates made to Smith that the incident had begun as a robbery.  (Ex. #21, at 3; Ex. #22, at 472.)

50

Detective Taylor did the photo array with Smith.  (Ex. #3.)  He wanted to ensure the Donald Gates the MPD had on file was the same person Smith knew as Donald Gates and who had the conversation with him during which he made the statements admitting the offense.  (Ex. #21 at 3.)  Smith was positive of his identification of Gates at the photo array.  (Ex. 3; see also Ex. 22 at 200, 380 (discussing procedures), 384 (did not suggest that Smith pick out photo of Gates).)  Taylor received the results of the microscopic hair analysis from the FBI.  These results showed that the pubic hairs of Donald Gates were microscopically similar to foreign public hairs recovered from the victim.  (Ex. #21 at 4; Ex. 3.)  Detective Taylor used the identification and microscopic hair analysis to obtain the warrant for Gates' arrest.  (Ex. #21 at 4; Ex. 3.)

Detective Taylor was unaware that Smith had been an informant for anyone but the robbery branch, including that he was an informant in other homicide cases, if that was so.  (Ex. #21 at 5-6.)  He had no knowledge that Smith had been used to conduct a controlled narcotics buy and allegedly took off with the money rather than making the buy.  (Ex. #21 at 5.)  Detective Taylor had no recollection of a remark from a person who was at the time of the investigation a homicide investigator named Hennessey, in which he allegedly told Detective Taylor that Smith was unreliable and untrustworthy.  (Ex. #21, at 5; Ex. #22, at 279, 283.)

Detective Taylor does not believe that he was involved in obtaining payments to Smith. (Ex. #21 at 6; Ex. #22, at 209.)  He did not did not have authority to dismiss charges against him, and he played no role in that decision.  (Ex. #21 at 6.)  Although Detective Taylor has no specific recollection of meeting with prosecutors in the Schilling case, it is probable that he did.  He was aware of the responsibility of detectives in his position to turn over to information to prosecutors that would be favorable to the criminal defendant's defense.  The investigators' files contained, among other things, the PD 251 arrest report, death report, case resume, running resume, and

copies of our notes.  He would meet the responsibility by turning over file materials and meeting with prosecutors on request.  (Ex. #21, at 6; Ex. #22, at 179-182, 226, 228, 446, 473.)

The prosecutor decided what information to provide to Gates' defense counsel and the jury about Smith and whether to sponsor his testimony as a witness.  (Ex. #21 at 6.)  Likewise, Detective Taylor did not decide what evidence to present or exclude at trial.  (Ex. #21 at 6.)

Detective Taylor did not provide Gates' full name or other details about the crime to Smith to bolster his testimony, and he did not fail to call prosecutors' attention to negative information that he knew of about Smith's trustworthiness.  (Ex. #21 at 6.)  He has no knowledge of the Plaintiff's claims that Detective Brooks and/or Lt. Harlow provided Gates' full name or other details about the crime to Smith to bolster his testimony; or that Detective Brooks and/or Lt. Harlow failed to call prosecutors' attention to negative information, if any, they knew about Smith's trustworthiness.  (Ex. #21 at 6-7.)

Detective Taylor is not aware of misconduct of any kind by Detective Brooks and/or Lt. Harlow concerning this case.  Detective Taylor denies any misconduct by himself concerning this case.  (Ex. #21, at 7; Ex. #22, at 222, 224, 470, 474.)  He says standard investigative procedures were followed by all three of them.  (Ex. #21, at 7; Ex. #22, at 443.)

On these uncontested facts, Detective Brooks did not violate the Plaintiff's due process right to a fair trial and/or is entitled to qualified immunity because a reasonable police officer in his position at the time would not have known he was violating clearly established due process rights.

6.     Summary Judgment should be Granted in Favor of the Individual Defendants on the Plaintiff's Failure to Intercede Claim (Count III) of the Complaint

a.     Allegations in Complaint

Count III of the Complaint is also brought against the three MPD former detectives for allegedly failing to intercede in violation of the Fifth and Fourteenth Amendments, enforceable through 42 U.S.C. § 1983.  (Complaint, ¶¶ 125-130.)  Specifically, the Plaintiff alleges that the Defendants had opportunities to intercede on behalf of the Plaintiff to prevent the violation of his due process right to a fair trial, but, due to their intentional conduct and/or reckless or deliberate indifference, they declined or refused to do so.  (Complaint, ¶ 126.)

b.     The Legal Standard

The Plaintiff must show that a Defendant had reason to know that a constitutional violation was occurring and that he had a reasonable opportunity to intervene and prevent it. *Beaman v. Souk*, 2011 WL 832506, *12 (C.D. Ill March 3, 2011), citing *Chavez v. Illinois State Police*; 251 F.3d 612, 652 (7th Cir. 2001); *see also Fernandors v. District of Columbia*, 382 F.Supp.2d 63, 72 (D.D.C.2005) ("Under the bystander theory of liability an officer is held responsible for a constitutional violation if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."), citing *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir.2002).

c.     Application

As argued extensively, the Plaintiff cannot adduce evidence that one or more Defendants violated his due process right to a fair trial.  Therefore, the Court should not reach the issue of whether one or more of the other Defendants should have prevented a violation.  Lieutenant Harlow's involvement with the case ended with introducing Smith to Detectives Taylor and

Books.  Detective Brooks clearly did not participate in the photo array and there is no evidence

that he testified in the grand jury or trial.  Detective Taylor likely testified at trial, although the

briefs do not identify him by name.  By then, the Court had ruled the photo identification not

suggestive and admissible; and by then, the prosecutors had provided *Brady* disclosures on

Smith.  None of these Defendants had knowledge or would have reason to believe that another

Defendant was violating the Plaintiff's due process right to a fair trial.  (Ex. #17; Ex. #19 at 5;

Ex. #21 at 6-7.)  Therefore, there was no need to act.  Accordingly, on the merits or on the basis

of qualified immunity, Summary Judgment should be granted in favor of the individual

Defendants on the Plaintiff's failure to intercede claim (Count III) of the Complaint.

> 7.　　Summary Judgment should be Granted in Favor of the Individual Defendants
> on the Plaintiff's Conspiracy Claim (Count IV) of the Complaint

>> a.　　Allegations in Complaint

Count IV of the Complaint is also brought against the three former MPD detectives,

alleging they conspired to violate the Plaintiff's Fifth and Fourteenth Amendment due process

right to a fair trial, enforceable through 42 U.S.C. § 1983.  (Complaint, ¶¶ 131-130.)

>> b.　　The Legal Standard

A § 1983 conspiracy claim requires the Plaintiff to prove: (1) an express or implied

agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual

deprivation of those rights in the form of overt acts in furtherance of the agreement.  *Beaman v.

Souk*, 2011 WL 832506, *10 (C.D. Ill March 3, 2011), citing *Scherer v. Balkema*, 840 F.2d 437,

441-442 (7th Cir. 1988).

Under the intra-corporate conspiracy theory, employees of a single entity acting within

the scope of their employment cannot enter into a conspiracy.  *See Rawlings v. District of

Columbia*, 820 F.Supp.2d 92, 104-105 (D.D.C. 2011); *see also Hamilton v. District of Columbia*,

2010 U.S. Dist. LEXIS 66585, at *10-12 (D.D.C., Jul. 6, 2010) (holding that D.C. Fire and

Emergency Medical Services Department and its officials were part of single entity incapable of

entering into conspiracy).  "D.C. government officials, acting within the scope of their

employment, are considered members of a single entity for the purposes of § 1985 [conspiracy to

violate civil rights]."  *James Taylor Trash Removal v. Dist. of Columbia*, 1999 U.S. Dist. LEXIS

13845, at *8-9 (D.D.C. 1999); *see also McMillian v. Dist. of Columbia*, 466 F. Supp. 2d 219, 223

(D.D.C. 2006).

      c.    <u>Application</u>

In this case, there is no evidence that any of the Defendants committed any of the acts

alleged, fabricating evidence; suggesting Gates identification to Smith; withholding *Brady*

material; or recruiting Smith to give false testimony, let alone that they entered into an express or

implied agreement to commit those acts.  Even if that was the case, and it was not, the

Defendants were all employees of the same entity at the time of the alleged conspiracy, the

District of Columbia government, acting within the scope of their employment.  As such, they

cannot have entered into a conspiracy.

Accordingly, on the merits or on the basis of qualified immunity, Summary Judgment

should be granted in favor of the individual Defendants on the Plaintiff's Conspiracy Claim

(Count IV) of the Complaint.

      7.    <u>Summary Judgment should be Granted in Favor of the District of Columbia</u>
                <u>on the Plaintiff's Municipal Liability Claim (Count V) of the Complaint</u>

      a.    <u>Allegations in Complaint</u>

Count V of the Complaint purports to be a municipal liability claim, enforceable through

42 U.S.C. § 1983, against the District of Columbia for maintaining an unconstitutional policy or

custom and for failing to supervise and train police officers, detectives and investigators.

(Complaint, ¶¶ 136-142.)  The Plaintiff asserts that, as of the time of the C. S. rape/murder, the District had a "policy, practice or custom of fabricating evidence, suggesting identification, and withholding exculpatory and impeachment evidence through the use of informants, thus depriving criminal defendants of their clearly established constitutional rights to due process of law and a fair trial under the Fifth and Fourteenth (sic) Amendments . . .."  (Complaint, ¶ 137.)

Count V of the Complaint also alleges that the District had a policy of failing to train, supervise, and discipline police officers, detectives and investigators.  (Complaint, ¶¶ 138-142.)  Specifically, the Plaintiff alleges that the District "systematically failed to adequately train its police officers, detectives and investigators not to fabricate evidence, suggest identification, or withhold material exculpatory and impeachment evidence from prosecutors through the use of informants."  (Complaint, ¶ 138.)  The Plaintiff contends that the failures to train, supervise and discipline "amounted to deliberate indifference to the constitutional rights of criminal defendants, including [the Plaintiff], and were the moving force behind defendant Smith's inculpatory statements, causing [the Plaintiff's] arrest, prosecution, and incarceration . . .." (Complaint, ¶ 142.)

> b.   The Legal Standard

If, as the District has argued, the individual Defendants did not commit a constitutional violation, then there can be no liability against the District.  *See City Los Angeles v. Heller*, 475 U.S. 796 (1986); *Olaniyi v. District of Columbia*, 876 F.Supp.2d 39, 48-49 (D.D.C. 2012). However, even if, contrary to the District's position, the individual Defendants did violate the Plaintiff's Fifth Amendment due process rights, the Plaintiff must nevertheless prove that the District had a policy or custom and that it caused the deprivation.  *Monell v. Department of*

*Social Services*, 436 U.S. 658 (1978); *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C.

Cir. 2003); *Hunter v. District of Columbia*, 824 F.Supp.2d 125, 132-133 (D.D.C. 2011).

It is elementary that there is no respondeat superior liability.  *Monell*, 436 U.S. at 691.

Municipal liability can only be established through (1) an official written unconstitutional policy,

*Monell*, 436 U.S. at 694-951; *Baker*, 326 F.3d at 1306; *Hunter*, 824 F.Supp.2d at 133; (2) a

single act of a person with final policy making authority, *Pembaur v. City of Cincinnati*, 475

U.S. 469 (1986); *Baker*, 326 F.3d at 1306; *Hunter*, 824 F.Supp.2d at 133; (3) an unwritten

custom, persistent pattern or practice of municipal officials of violating constitutional rights that

has become so permanent and well-settled as to constitute the official policy, *Monell*, at 691;

*Adickes v. S.H. Kress & Co*, 398 U.S. 144, 167-68 (1970); *Baker*, 326 F.3d at 1306; *Hunter*, 824

F.Supp.2d at 133; or (4) a policy, custom, or practice of "deliberate indifference" to obvious

risks that deficiencies in hiring, training, supervision or discipline of city employees will cause

the deprivation of constitutional rights, *Connick v. Thompson*, 131 S.Ct. 1350 (2011); *City of*

*Canton v. Harris*, 489 U.S. 378 (1989); *Baker*, 326 F.3d at 1306-07; *Hunter*, 824 F.Supp.2d at

133.  Regardless of the theory of recovery, a specifically identified municipal policy or custom

must be the moving force behind the constitutional violation.  *Connick*, 131 S.Ct. at 1359-60;

*Harris*, 489 U.S. at 389; *Baker*, 326 F.3d at 1306.

Here, the Plaintiff does not appear to premise his right to recover on (1) an official

written unconstitutional policy, or (2) a single act of a person with final policy making authority.

The third basis, (3) that there was an unwritten custom, persistent pattern or practice of

municipal officials of violating constitutional rights that has become so permanent and well-

settled as to constitute the official policy, is easily disposed of.  While the Plaintiff asserts that as

of the time of the C. S. rape/murder the District had a "policy, practice or custom of fabricating

evidence, suggesting identification, and withholding exculpatory and impeachment evidence

through the use of informants" (Complaint, ¶ 137.) there is no evidentiary support.  Discovery

has not produced any policy, pattern or practice within the MPD of fabricating evidence,

suggesting identification, and withholding exculpatory and impeachment evidence that caused

wrongful convictions.

That leaves the fourth theory, (4) a policy, custom, or practice of "deliberate

indifference" to obvious risks that deficiencies in hiring, training, supervision or discipline of

city employees will cause the deprivation of constitutional rights.  A municipality may be

responsible for a constitutional violation by a municipal employee when a municipality's failure

to train its employee reflects a deliberate indifference to the plaintiff's constitutionality protected

rights.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  In *Canton*, the Supreme Court

imposed strict limitations on municipal liability under § 1983 for lapses in training:  "Only where

a municipality's failure to train its employees in a relevant respect evidences a deliberate

indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a

city policy or custom that is actionable under § 1983."  *Id*.  In *Connick v. Thompson*, 131 S.Ct.

1350 (2011), the plaintiff alleged that the district attorney had failed to train his prosecutors

adequately about their duty to produce *Brady* evidence and that the lack of training had caused

the nondisclosure in plaintiff's robbery case.  The Court declined to impose municipal liability

because there was no evidence that would have the put the district attorney on notice "that the

office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue."  *Id*. at

1360.  Namely, the plaintiff "did not prove a pattern of similar violations that would 'establish

that the policy of inaction [was] the functional equivalent of a decision by the city itself to

violate the Constitution.'"  *Id*. at 1366 (citation omitted).  *See also Olaniyi*, 876 F.Supp.2d at 48-

49.  However, the "deliberate indifference to training" theory of municipality does not apply to intentional misconduct.  *Bibbins v. City of Baton Rouge*, 489 F.Supp.2d 562, 583 (M.D. La. 2007) ("With intentional misconduct, such as *Brady* violations, no amount of training would stop a rogue officer from violating one's rights.")

c.  Application

There is no evidence in this case that any of the three individual Defendants violated the Plaintiff's due process rights to cause him to be wrongfully convicted.  But even if that was the case, the Plaintiff cannot demonstrate that it was because the District maintained a policy or custom of deliberate indifference to training.  MPD policies and practices for training detectives in the early 1980s was not the subject of discovery in this case, and, therefore, no general deficiencies were identified.  On the contrary, each of the Defendants attended the basic police academy course; took courses in investigative techniques when they became detectives; and went to homicide school.  (Ex. #17 at 1-2; see also Ex. # 18 at 46, 50; Ex. #19 at 1-2; see also Ex. # 20 at 38-56, 101-102, 110; Ex. #21 at 1; Ex. #22 at 170-173.)  They knew it was important for informants to be reliable.  (See Ex. #17 at 2 (Smith provided useful information); see also Ex. # 18 at 69, 173, 176, 226; Ex. #19 at 4; see also Ex. # 20 at 162, 38-56, 101-102, 110; Ex. #21 at 5; Ex. #22 at 153, 219, 273, 278, 282, 465.)  And each knew that they had to turn the information in their files over to prosecutors.  (Ex. # 18 at 158; Ex. #19 at 4; see also Ex. # 20 at 97, 136; Ex. #21 at 6; Ex. #22 at 228, 446.)  If, contrary to all of the evidence in this case, one or more of the Defendants created false evidence and framed Gates by suborning the perjury of Smith, then no amount of training could have prevented that.

Summary Judgment should be granted in favor of the District of Columbia on the Plaintiff's municipal liability claim (Count V) of the Complaint.

<u>Conclusion</u>

The fact that the Plaintiff can demonstrate that he was erroneously convicted should not lead this Court to the conclusion that he was wrongfully convicted by the misconduct of the Defendants.  The evidence against Gates was strong.  He mugged a young woman three weeks before in the same place as the C.S. rape/murder.  Gates' pubic hair microscopically matched foreign pubic hair found on the victim.  Gates' own expert on hair analysis said the error rate in such an analysis was only 1 in 800 or 1 in 100, depending on which of two studies he referenced.

Then there was the testimony of Smith.  The Plaintiff claims that his narrative was bolstered by police, that they told him Gates' name and planted the fact that the crime began as a robbery.  The Plaintiff has made much of theory that the detectives did not do more to vet the Smith background and narrative, but in order to prevail, the Plaintiff must show that police misconduct actually caused his conviction.  By the time Smith testified, the defense and the jury heard that Smith had serious felony convictions, that he received money in exchange for his information, and that he had three shoplifting and a theft after trust charge dropped, all in exchange for his cooperation with police.  Yet the three Defendants, a series of prosecutors at the investigation leading to the warrant, the grand jury and the jury trial, vetted and sponsored his testimony.  And the jury believed it, even being discerning not to accept his testimony that the crime began as a robbery, because they found him not guilty of that.

There is no affirmative evidence that the Defendants fabricated or bolstered the Smith narrative, that Detective Taylor suggested the Smith identification of Gates, or that the Defendants failed to bring prosecutors' attention to *Brady* material that would have affected the result of the trial.  And because the underlying due process claims fail, the derivative failure to

60

intervene, conspiracy and municipal liability claims also fail.  The Court should award summary

judgment for the Defendants on Counts II through V of the Complaint.

**DATED:  June 23, 2013**                        Respectfully submitted,

                                                 IRVIN B. NATHAN
                                                 Attorney General for the District of Columbia

                                                 GEORGE C. VALENTINE
                                                 Deputy Attorney General, Civil Litigation Division

                                                 /s/ Kimberly Matthews Johnson
                                                 KIMBERLY M. JOHNSON [435163]
                                                 Chief, General Litigation Section 1

                                                 /s/   Wayne C. Beyer
                                                 WAYNE C. BEYER [452245]
                                                 Assistant Attorney General
                                                 441 4th Street, N.W., 6th Floor-South
                                                 Washington, D.C.  20001
                                                 Tel: (202) 442-9891
                                                 Fax: (202) 730-0637
                                                 Wayne.Beyer@dc.gov