## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DONALD EUGENE GATES,** | ) |
| | ) |
| *Plaintiff,* | )     **Civil Action No. 11-0040 (RWR/AK)** |
| | ) |
| **v.** | ) |
| | ) |
| **DISTRICT OF COLUMBIA,** *et al.* | ) |
| | ) |
| *Defendants.* | ) |
| _____ | ) |

### DISTRICT OF COLUMBIA DEFENDANTS' RESPONSE TO PLAINTIFF'S
### STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**Catherine Schilling was raped and murdered by one person[1]**

1.    On June 22, 1981, at approximately 9:30 p.m., 21-year-old Catherine Schilling left the Watergate offices where she worked as a paralegal. [Exhibit 1 (Gov't App. Brief) p. 2–3.] She never made it home. [Exhibit 1 (Gov't App. Brief) p. 3.] "John Doe" attacked Ms. Schilling in Rock Creek Park, stripped her of her clothes, and raped her before shooting her five times in the head from close range. [Exhibit 1 (Gov't App. Brief) p. 3–5; Exhibit 2 (Gov't Opp. to Def. Mot. to Supp.) p. 1; Exhibit 3 (MPD Death Report); Exhibit 4 (Autopsy Report) p. 1, 3–5, 7–9.]

    **Response:** Undisputed.

2.    The next day, her body was discovered in Rock Creek Park. [Exhibit 1 (Gov't App. Brief) p. 3; Exhibit 2 (Gov't Opp. to Def. Mot. to Supp.) p. 1; Exhibit 3 (MPD Death Report).] A bullet was found embedded in the ground near Ms. Schilling's head, and at least four additional bullets that struck and killed Ms. Schilling were recovered at the scene. [Exhibit 1 (Gov't App. Brief) p. 4–5; Exhibit 5 (Evidence Report) p. 1, 3; Exhibit 6 (MPD Receipt of Property).] Her body was nude, and "[s]emen was found oozing from her vagina." [Exhibit 2 (Gov't Opp. to Def. Mot. to Supp.) p. 1; Exhibit 7 (Gov't Mot. to Admit Other Crimes Evid.) p. 1.] No semen or sperm cells were detected on her underwear, which lay on the ground nearby. [Exhibit 8 (FBI Lab Worksheet) p. 1 (identifying Schilling's underwear as "Q2"); Exhibit 9 (9/16/81 FBI Report) p. 2 (indicating no semen found on Q2); Exhibit 5 (Evidence Report) p. 1.]

    **Response:** Undisputed.

---

[1] Plaintiff's headings are included in the Defendants' Response for clarity and consistency.  They are not assertions of facts pursuant to Fed. R. Civ. P. 56(c) or LCvR 7(h) as they contain no citation to the record or reference to admissible evidence.

3.      A rape kit was taken, including combings of Ms. Schilling's pubic hair and swabs of the vaginal area. [Exhibit 1 (Gov't App. Brief) p. 5; Exhibit 5 (Evidence Report) p. 1; Exhibit 6 (MPD Receipt of Property) p. 1); Exhibit 10 (Supplementary Evidence Report).] "Large numbers" of sperm were found on the vaginal swabs [Exhibit 4 (Autopsy Report) p. 8], indicating that the semen was deposited immediately prior to Ms. Schilling's death. [Exhibit 11 (Word Report) p. 5, ¶¶ 12–13.] Likewise, the absence of semen in Ms. Schilling's underwear is indicative of the fact that the semen was deposited at the scene, after her underwear was removed, and not by an earlier consensual partner. [*Id*. at p. 5, ¶ 13.]

        **Response:**  Disputed.  Plaintiff relies on the opinion testimony of an individual, Charlotte Word, who was not present during or before the rape and homicide of Catherine Schilling.  Plaintiff's proffer of evidence he hopes to elicit from AUSA Michael Ambrosino is likewise inadmissible hearsay.

4.      Consistent with the physical evidence, the prosecution's theory at Mr. Gates's criminal trial was that the rape and murder was a committed by a single perpetrator. [Exhibit 12 (Harrington Dep.) 162:6–163:1; Exhibit 13 (Taylor Dep.) 404:21–405:12; Exhibit 14 (Trainum Dep.) 64:17–22.]

        **Response:**  Disputed.  Plaintiff relies on the inadmissible opinion testimony of three individuals, none of whom were an eye witness to the rape or homicide of Catherine Schilling and are therefore not competent to testify to the facts Plaintiff proffers.

5.      In September 1982, the United States Attorney's Office prosecuted Mr. Gates. He was tried in D.C. Superior Court and convicted on September 16, 1982, of rape while armed, felony murder while armed and attempting a rape, and carrying a pistol without a license. [Exhibit 1 (Gov't App. Brief) p. 1; Exhibit 15 (Judgment and Commitment Order).] He was sentenced by D.C. Superior Court Judge Fred B. Ugast to a total of twenty years to life imprisonment. [Exhibit 1 (Gov't App. Brief) p. 1; Exhibit 15 (Judgment and Commitment Order).]

        **Response:**  Undisputed.

**DNA testing conclusively proves that Donald Gates was not Ms. Schilling's assailant**

6.      On November 13, 2008, pursuant to the District of Columbia Innocence Protection Act, Mr. Gates filed a petition seeking post-conviction DNA testing of biological evidence collected during Ms. Schilling's autopsy. [Exhibit 16 (App. for DNA testing).]

        **Response:**  Undisputed.

7.      The United States did not oppose Mr. Gates's motion and, in fact, agreed to assist Mr. Gates in locating the evidence required for DNA testing. [Exhibit 17 (Gov't Resp. to App. for DNA Testing); Exhibit 28 (Hearing Transcript) 3:22–4:5.] After much searching, Detective James Trainum, under the direction of the U.S. Attorney's Office,

located in the Medical Examiner's office slides which contained sperm cells taken from the victim's vaginal area at autopsy. [Exhibit 14 (Trainum Dep.) 50:15–57:21; Exhibit 17 (Gov't Resp. to App. For DNA Testing) p. 9–14; Exhibit 28 (Hearing Transcript) 4:2–18.]

**Response:**  Undisputed.

8.      After these vaginal slides were located, Judge Ugast granted Mr. Gates's motion and ordered that DNA testing of the slides be conducted by two private DNA testing laboratories: National Medical Services ("NMS"), the laboratory selected by Mr. Gates's counsel, and Bode Technologies, a laboratory commissioned by the United States. [Exhibit 18 (11/17/09 Order); Exhibit 19 (11/18/09 Order).]

**Response:**  Undisputed.

9.      The DNA testing conducted by both NMS and Bode Technologies indicated that the semen collected from Ms. Schilling's body was deposited by a single sperm donor. [Exhibit 28 (Hearing Transcript) 6:2–9, 10:15–11:3.] NMS conducted two highly sophisticated tests, the PowerPlex 16 and PowerPlex Y, on the sperm from the vaginal slides in order to obtain a profile of the perpetrator. [Exhibit 20 (NMS Report).] That profile was compared to the DNA profile obtained from a reference sample taken from Mr. Gates. *Id*. NMS determined that Mr. Gates's DNA profile is inconsistent with the profile of the perpetrator. *Id*. Bode Technologies, using similar testing, also concluded that Mr. Gates was excluded as a possible contributor of the sperm on the vaginal slides. [Exhibit 21 (Bode Technologies Report).]

**Response:**  Undisputed.

10.     Analysis by both laboratories conclusively established that the rapist/murderer's semen could not have come from Mr. Gates. It is scientifically impossible for Mr. Gates to have deposited the sperm recovered from the victim at autopsy. [Exhibit 30 (Defendants' Responses to Requests for Admissions) Response #4.]

**Response:**  The District of Columbia Defendants do not dispute that the biological material that was actually tested established that the tested sample could not have come from Mr. Gates.

### Mr. Gates's convictions are vacated

11.     On the basis of the DNA test results, Mr. Gates filed a motion to vacate his convictions on the grounds of actual innocence. [Exhibit 22 (Motion to Vacate); Exhibit 28 (Hearing Transcript) 5:19–6:16.]

**Response:**  Undisputed.

12.      The United States agreed that the DNA test results gave rise to "exceptional circumstances" under which Mr. Gates should be released from custody, pending resolution of his motion to vacate his convictions. [Exhibit 23 (Gov't Resp. to Mot. to Vacate) at p. 2–3; Exhibit 28 (Hearing Transcript) 10:4–9.] On December 15, 2009, Judge Ugast ordered Mr. Gates released from custody. [Exhibit 24 (Release Order).]

      **Response:**  Undisputed.

13.      The United States, however, sought and was granted additional time to more fully consider Mr. Gates's motion to vacate his convictions. [Exhibit 23 (Gov't Resp. to Mot. to Vacate) p. 2–3; Exhibit 28 (Hearing Transcript) 10:10–12:12.] After further analysis, the U.S. Attorney's Office moved to join Mr. Gates's motion to vacate his convictions on the grounds of actual innocence and requested that the Court find "by clear and convincing evidence that Mr. Gates is actually innocent of the June 22, 1981, rape and murder of Catherine Schilling, and of all charges connected with that crime." [Exhibit 25 (Gov't Mot. to Join Mot. to Vacate) at *3 (proposed order) (emphasis in original).]

      **Response:**  Undisputed.

14.      On December 18, 2009, Judge Ugast vacated Mr. Gates's convictions and dismissed the charges against him with prejudice on the basis that clear and convincing evidence showed Mr. Gates to be actually innocent of the rape and murder of Catherine Schilling. [Exhibit 26 (Order vacating convictions).]

      **Response:**  Undisputed.

**Mr. Gates is granted a Certificate of Actual Innocence**

15.      After his convictions were vacated and all charges dismissed, Mr. Gates filed an unopposed motion for issuance of a Certificate of Actual Innocence. [Exhibit 29 (Unopp. Mot. For Certificate of Innocence).]

      **Response:**  Undisputed.

16.      Judge Ugast then issued a Certificate of Actual Innocence, finding by clear and convincing evidence that:

> Donald Gates did not commit any of the acts charged, nor did he commit any act, deed or omission in connection with the acts charged that constituted an offense against the United States, or any State, territory or the District of Columbia. He is actually innocent.

> Donald Gates did not by misconduct or neglect cause or bring about his own prosecution or conviction.

[Exhibit 27 (Certificate of Actual Innocence).]

**Response:**  Undisputed.

17.  Donald Gates did not commit any of the acts charged, nor did he commit any act, deed or omission in connection with the acts charged that constituted an offense against the United States, or any State, territory or the District of Columbia. He is actually innocent. *See supra* ¶¶ 1–16.

**Response:**  The District Defendants do not dispute that there exists no evidence to prove by clear and convincing evidence that Donald Gates committed any of the acts charged, or that he committed any act, deed or omission in connection with the acts charged that constituted an offense against the United States, or any State, territory or the District of Columbia.  Whether Mr. Gates is "actually innocent" is a legal conclusion that Plaintiff must prove to prevail on his claim against the District pursuant to D.C. Code § 2-421 *et seq*.

18.  Donald Gates did not by misconduct or neglect cause or bring about his own prosecution or conviction. *See*, *supra*, ¶¶ 1–16.

**Response:**  Disputed.  There exists a genuine factual dispute as to whether Mr. Gates confessed to his involvement in the crime to Gerald Smith.  While it was undisputed at that time of Plaintiff's criminal trial that this confession was made as Plaintiff offered no contradictory evidence, later, in post-conviction proceedings the dispute was raised.  Mr. Gates also acknowledged his participation in another assault of a woman in the same location of the rape and homicide of Ms. Schilling, and evidence of this other crime was presented at Mr. Gates' criminal trial in the Schilling matter and thus contributed to his prosecution and conviction.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation

KIMBERLY M. JOHNSON [435163]
Chief, General Litigation Sec. I

/s/ Wayne C. Beyer
WAYNE C. BEYER [452245]
Assistant Attorney General

/s/ Shana L. Frost
SHANA L. FROST [458021]
Assistant Attorney General

441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6534
Fax: 741-8934
shana.frost@dc.gov

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DONALD EUGENE GATES,** | ) |
| | ) |
| *Plaintiff,* | ) **Civil Action No. 11-0040 (RWR/AK)** |
| | ) |
| **v.** | ) |
| | ) |
| **DISTRICT OF COLUMBIA,** *et al.* | ) |
| | ) |
| *Defendants.* | ) |
| _____ | ) |

## DISTRICT OF COLUMBIA DEFENDANTS' COUNTERSTATEMENT OF MATERIAL FACTS

1. On June 22, 1981, Georgetown University student Catherine Schilling was raped and murdered in Rock Creek Park on her way home from her part-time job at a law firm located in the Watergate.  *Donald E. Gates v. United States*, No. 82-1529, Brief for Appellee (Ex. 1) at 2.

2. Defendants Ronald Taylor and Norman Brooks, both Detectives with the Metropolitan Police Department at that time, were assigned to investigate this rape/homicide.  Pl.'s Compl. ¶ 29.

3. Approximately one week after the rape and murder of Ms. Schilling, witness Gerald Smith informed the homicide detectives that Donald Gates, a man that Mr. Smith drank with in the park, confessed to Mr. Smith that he had attempted to rob a young, white woman in the park area near Georgetown, and ended up raping and killing her.  Ex. 1 at 6-7.

4. Mr. Smith was shown a photo array from which he identified Plaintiff as the man that confessed to him.  Ex. 1 at 8.

5. Days before the Schilling incident, Plaintiff was identified and arrested for the March 10, 1981 rape of another woman in Rock Creek Park.  Pl.'s Compl. ¶ 29.  The charges against Plaintiff were dropped when it was revealed that Plaintiff was actually incarcerated at the time of that rape.  Pl.'s Compl. ¶ 30.

6. Plaintiff acknowledged that he assaulted a young woman near Union Station on May 11, 1980.  Deposition of Donald Eugene Gates (Ex. 2) at 25-27.  Plaintiff pled guilty to simple assault for that offense on October 30, 1980, and received a 30-day sentence.  Ex. 2 at 27.

7. On March 2, 1981, Plaintiff was arrested for theft at the Smithsonian, and pled guilty to that offense on March 24, 1981 and was sentenced to time served.  Ex. 2 at 28-29.

8. Plaintiff also acknowledged that on June 3, 1981, just 19 days before the rape and murder of Catherine Schilling (and in the same vicinity of that crime), he attempted to rob and assaulted another woman in Rock Creek Park.  Ex. 2 at 33-37.

9. At Plaintiff's criminal trial for the rape and murder of Ms. Schilling, the prosecution called Gerald Smith as a witness.  Mr. Smith testified that he and others would drink throughout the day at Washington Circle and other public areas on Pennsylvania Avenue.  Ex. 1 at 6-7.

10. Mr. Smith testified that Donald Gates was one of the men with whom he would drink.  Specifically, "Smith identified [Plaintiff] in court as someone he would encounter in the Washington Circle area during the first half of 1981.  He had seen [Plaintiff] for the first time in early February or March 1981, and recalled seeing him an average of once or twice a week thereafter.  Smith knew [Plaintiff's] first and last names…" Ex. 1 at 7.

11. Mr. Smith also told the jury that he had "a specific conversation with [Plaintiff] near the end of June, 1981, during the morning hours, at the park at 25th and Pennsylvania Avenue.  [Plaintiff] was 'a little high' because the men had all been drinking.  [Plaintiff] told Smith during this conversation that 'he went on a hell of caper a couple [of] days ago.  The caper consisted[of] robbing a pretty, white girl.  All he had was intentions just to rob her, but she resisted.  And after she resisted, he raped her.  And then after it dawned on him what he had done, he shot her.'  [Plaintiff] told Smith that the crime had occurred in a park and that he had left the victim 'cut and dry.'"  Ex. 1 at 7.

12. Although Plaintiff did not dispute Mr. Smith's testimony at his criminal trial with any affirmative evidence, Plaintiff now denies that he knew or ever met Mr. Smith, and further denies that he confessed to Mr. Smith that he raped and murdered Ms. Schilling. Ex. 2 at 66-71.

13. During Plaintiff's criminal trial, the jury was informed about Smith's prior criminal record, the money he received and the charges that were dropped for his providing information.  Smith admitted that he had been convicted of unlawful possession of stolen mail (1971), armed robbery (1972), possession of an unregistered firearm (1975), and false pretenses (1975).  Ex. 1 at 6, n.7.

14. The jury also was informed that "Smith, who had been reporting information to the police for pay for eight months to a year prior to June of 1981, was initially paid $50 and not asked to do anything at that point.  He subsequently received another $250, and agreed to notify the police the next time he saw [Plaintiff]."  "He later received $1000 from Crime Solvers after testifying before the grand jury about his conversation with [Plaintiff]."  Ex. 1 at 6, n.7.

15. The jury also heard testimony that, "[f]or his testimony in the grand jury and at trial, and for his information and cooperation with respect to two other serious felony cases, the government agreed to arrange for the dismissal of four cases pending against Smith – three shoplifting cases in Maryland and a larceny after trust case in the District of Columbia. [Smith] received no promises as to the dismissal of two other shoplifting cases pending against him in Maryland." Ex. 1 at 7, n.8.

16. Mr. Smith, who suffers from various health issues and memory loss, had no recollection of his testimony in the Schilling homicide trial, his cooperation with the police or prosecution, or of Plaintiff. *See* Deposition of Gerald Smith (Ex. 3) at 64-65; 78-79; 91-92; 107-08; 131; 139-40; 202-03; 205-06; 230-32.

17. During Plaintiff's criminal proceedings, the jury also heard evidence, over objection from counsel for Plaintiff, of Plaintiff's "other crimes" which were deemed admissible to show identity, intent, and common scheme or plan. Ex. 1 at 9-10. Specifically, the jury heard that on June 3, 1981, Plaintiff assaulted a young white woman near the towpath in Rock Creek Park during the evening rush hour. *Id.* at 9. The victim in that crime testified that Plaintiff followed her and came up around to her right, grabbed her arm and her purse (a large tote bag), and started pulling on the purse. *Id.* at 10. A struggle over the purse ensued, but Plaintiff let go of the purse, grabbed the woman's shoulders, and pushed her to the ground on her back about a foot from the sidewalk. *Id.* She testified that Plaintiff lost interest in the purse, and laid on top of her, nuzzling her face and mumbling incoherently. *Id.* Passers-by came to the aid of the victim, and restrained Plaintiff until police came and arrested him. *Id.* Plaintiff pled guilty to the assault. Ex. 2 at 37.

18. The "other crimes" evidence played a role in the prosecution of Plaintiff and contributed somewhat to Plaintiff's conviction.  Deposition of Brooks Harrington (Ex. 4) at 71-73; Ex. 2 at 83.


Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation

KIMBERLY M. JOHNSON [435163]
Chief, General Litigation Sec. I

/s/ Wayne C. Beyer_____
WAYNE C. BEYER [452245]
Assistant Attorney General

/s/ Shana L. Frost_____
SHANA L. FROST [458021]
Assistant Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6534
Fax: 741-8934
shana.frost@dc.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DONALD EUGENE GATES,** | ) | |
| | ) | |
| *Plaintiff,* | ) | **Civil Action No. 11-0040 (RWR/AK)** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **DISTRICT OF COLUMBIA,** *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

**DISTRICT OF COLUMBIA DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

On June 22, 1981, Georgetown University student Catherine Schilling was raped and murdered in Rock Creek Park on her way home from her part-time job at a law firm located in the Watergate.  Defs.' Stmt. of Disputed Facts (Defs.' Stmt.") ¶ 1.  Defendants Ronald Taylor and Norman Brooks, both Detectives with the Metropolitan Police Department at that time, were assigned to investigate this rape/homicide.  Defs.' Stmt. ¶ 2.  Approximately one week after the rape and murder of Ms. Schilling, witness Gerald Smith informed the homicide detectives that Donald Gates, a man that Mr. Smith drank with in the park confessed to Mr. Smith that he had attempted to rob a young, white woman in the park area near Georgetown, and ended up raping and killing her.  Defs.' Stmt. ¶ 3.  Mr. Smith was shown a photo array from which he identified Plaintiff as the man that confessed to him.  Defs.' Stmt. ¶ 4.

Plaintiff was not unknown to law enforcement.  Days before the Schilling incident, Plaintiff was identified and arrested for the March 10, 1981 rape of another woman in Rock Creek Park.  Defs.' Stmt. ¶ 5.  The charges against Plaintiff were dropped when it was revealed that Plaintiff was actually incarcerated at the time of that rape.  *Id.*  Plaintiff acknowledged that he sexually assaulted a young woman near Union Station on May 11, 1980.  Defs.' Stmt. ¶ 6.

Plaintiff pled guilty to simple assault for that offense on October 30, 1980, and received a 30-day

sentence.  *Id.*  On March 2, 1981, Plaintiff was arrested for theft at the Smithsonian, and pled

guilty to that offense on March 24, 1981 and was sentenced to time served.  Defs.' Stmt. ¶ 7.

Plaintiff also acknowledged that on June 3, 1981, just 19 days before the rape and murder of

Catherine Schilling (and in the same vicinity of that crime), he attempted to rob and assaulted

another woman in Rock Creek Park.  Defs.' Stmt. ¶ 8.

Plaintiff was indicted and charged with the rape and homicide of Catherine Schilling.  Ex.

1 at 1.  The evidence presented by the prosecution included Mr. Smith's testimony.  According

to the appellate briefs prepared in Plaintiff's appellate proceedings, Mr. Smith used to drink in

the Washington Circle Park:

> Smith, who acknowledged his prior criminal record, testified that during the first six
> months of 1981, he went to Washington Circle about three or four times a week to drink
> with some street friends. He would usually arrive about 9:15 a.m., and the gathering
> would typically last until 3:00 – 4:00 p.m. The group would not stay the entire day at
> Washington Circle, but would move down Pennsylvania Avenue to other parks on that
> street.

Defs.' Stmt. ¶ 9.

One of the men Mr. Smith used to drink with was Plaintiff, who confessed to Mr. Smith

that he had started to rob, and then raped and murdered a young woman a few days before:

> Smith identified [Plaintiff] in court as someone he would encounter in the Washington
> Circle area during the first half of 1981. He had seen [Plaintiff] for the first time in early
> February or March 1981, and recalled seeing him an average of once or twice a week
> thereafter. Smith knew [Plaintiff] first and last names and recalled having a specific
> conversation with him near the end of June, 1981, during the morning hours, at the park
> at 25th and Pennsylvania Avenue. [Plaintiff] was "a little high" because the men had all
> been drinking. [Plaintiff] told Smith during this conversation that "he went on a hell of
> caper a couple [of] days ago. The caper consisted[of] robbing a pretty, white girl. All he
> had was intentions just to rob her, but she resisted. And after she resisted, he raped her.
> And then after it dawned on him what he had done, he shot her." [Plaintiff] told Smith
> that the crime had occurred in a park and that he had left the victim "cut and dry."

2

Defs.' Stmt. ¶¶ 10-11.  Plaintiff denies that he knew Mr. Smith, and further denies that he

confessed to Mr. Smith that he raped and murdered Ms. Schilling.  Defs.' Stmt. ¶ 12.  The jury

was informed about Mr. Smith's prior criminal record, the money he received and the charges

that were dropped for his providing information.  Mr. Smith admitted that he had been convicted

of unlawful possession of stolen mail (1971), armed robbery (1972), possession of an

unregistered firearm (1975), and false pretenses (1975).  Defs.' Stmt. ¶ 13.

There was also trial testimony that "Smith, who had been reporting information to the

police for pay for eight months to a year prior to June of 1981, was initially paid $50 and not

asked to do anything at that point. He subsequently received another $250, and agreed to notify

the police the next time he saw [Plaintiff]."  "He later received $1000 from Crime Solvers after

testifying before the grand jury about his conversation with [Plaintiff]."  Defs.' Stmt. ¶ 14.

The jury also heard testimony that, in exchange for his cooperation with police, Mr.

Smith received leniency on some pending charges:

> For his testimony in the grand jury and at trial, and for his information and cooperation
> with respect to two other serious felony cases, the government agreed to arrange for the
> dismissal of four cases pending against Smith – three shoplifting cases in Maryland and a
> larceny after trust case in the District of Columbia. He received no promises as to the
> dismissal of two other shoplifting cases pending against him in Maryland.

Defs.' Stmt. ¶ 15.  Plaintiff did not testify at trial, nor did he present any witness to dispute Mr.

Smith's testimony.  When deposed in this civil matter on July 20, 2012, Mr. Smith, who suffers

from various health issues and memory loss, had no recollection of his testimony in the Schilling

homicide trial, his cooperation with the police or prosecution, or of Plaintiff.  Defs.' Stmt. ¶ 16.

During Plaintiff's criminal proceedings, the jury also heard evidence, over objection from

counsel for Plaintiff, of Plaintiff's "other crimes" which were deemed admissible to show

identity, intent, and common scheme or plan.  Defs.' Stmt. ¶ 17.  Specifically, the jury heard that

on June 3, 1981, Plaintiff assaulted a young white woman near the towpath in Rock Creek Park during the evening rush hour. *Id*. The victim in that crime testified that Plaintiff followed her and came up around to her right, grabbed her arm and her purse (a large tote bag), and started pulling on the purse. *Id*. A struggle over the purse ensued, but Plaintiff let go of the purse, grabbed the woman's shoulders, and pushed her to the ground on her back about a foot from the sidewalk. *Id*. She testified that Plaintiff lost interest in the purse, and laid on top of her, nuzzling her face and mumbling incoherently. *Id.* Passers-by came to the aid of the victim, and restrained Plaintiff until police came and arrested him. *Id.* Plaintiff pled guilty to the assault. *Id.* In the opinion of the prosecutor in the Schilling case, this "other crimes" evidence played a role in the prosecution of Plaintiff, and Plaintiff also agreed that the incident contributed somewhat to his conviction. Defs.' Stmt. ¶ 18.

The prosecutor in the Schilling homicide described the case against Plaintiff as a three-legged stool, where one leg was Smith's testimony, the second leg the "other crimes" evidence, and the third the evidence of the microscopic hair analysis. Ex. 4 at 73. The facts presented by the first two legs prevent summary judgment for Plaintiff here. First, there is a material factual dispute as to whether Plaintiff confessed to Smith. While this fact was not contested at Plaintiff's criminal trial, Plaintiff now denies doing so, and Mr. Smith cannot recall his involvement in this matter thirty years ago. However, it is undisputed that Smith testified under oath at trial that Plaintiff stated that he was involved in the crime against Ms. Schilling. Thus, the factual dispute that Plaintiff presented at the post-conviction proceeding must be resolved at trial. Second, Plaintiff has acknowledged that he committed other crimes, which brought him to the attention of law enforcement, and specifically the assault and attempted robbery of a woman in the same vicinity as the rape and murder of Ms. Schilling, less than three weeks before Ms.

4

Schilling was killed.  Evidence of this similar crime, in the same location, and temporal

proximity to Ms. Schilling's rape and murder was presented against Plaintiff and contributed to

his prosecution.  Thus, Plaintiff's own actions served to partially bring about his conviction, and

Plaintiff cannot meet his burden for purposes of summary judgment.  Accordingly, Plaintiff's

motion should be denied.

## I.     Standard of Review

Summary judgment may only be granted if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R.

Civ. P. Rule 56(a).  Facts are material where they could affect the outcome of the matter under

the law governing it, and a dispute is genuine if the "evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986).  In ruling on a motion for summary judgment, "[a]ll underlying facts and

inferences are analyzed in the light most favorable to the non-moving party."  *N.S. ex rel. Stein v.*

*District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010) (citing *Anderson*, 477 U.S. at 247).

## II.    Plaintiff Has Failed to Meet His Burden As There Are Material Factual Disputes That Prevent Summary Judgment on Plaintiff's Unjust Imprisonment Act Claim

Plaintiff's common law claim for damages is brought pursuant to the District of

Columbia's Unjust Imprisonment Act, which provides a civil cause of action to "[a]ny person

unjustly convicted of and subsequently imprisoned for a criminal offense contained in the

District of Columbia Official Code."  D.C. Code § 2-421.  To prevail on a claim under the Unjust

Imprisonment Act, Plaintiff must prove:

> (1) That his conviction has been reversed or set aside on the ground that he is not
> guilty of the offense of which he was convicted, or on new trial or rehearing was
> found not guilty of such offense, as appears from the record or certificate of the

court setting aside or reversing such conviction, or that he has been pardoned upon the stated ground of innocence and unjust conviction; and

(2) That, based upon clear and convincing evidence, he did not commit any of the acts charged or his acts or omissions in connection with such charge constituted no offense against the United States or the District of Columbia the maximum penalty for which would equal or exceed the imprisonment served and he did not, by his misconduct, cause or bring about his own prosecution.

D.C. Code § 2-422. Here, Plaintiff has not demonstrated that the undisputed material facts prove that "he did not, by his misconduct, cause or bring about his own prosecution."

Rather, although no evidence to dispute the confession was presented at the time of Plaintiff's criminal trial, Plaintiff has more recently created a material factual dispute as to whether Plaintiff confessed his involvement in the Schilling rape and murder to government witness Gerald Smith. While Plaintiff now denies the confession, and Mr. Smith can no longer recall the events of more than 30 years ago, it is without dispute that Mr. Smith testified under oath at Plaintiff's criminal trial that he knew Plaintiff and Plaintiff confessed the crime to him. If such a confession occurred, Plaintiff would have "caused or [brought] about" his own prosecution.

Second, another contribution to Plaintiff's conviction was his guilty plea to an assault of a woman in the same geographical area just a few weeks before the rape and murder of Ms. Schilling. This evidence was introduced at Plaintiff's trial, and a material factual dispute exists as to whether Plaintiff's own prior bad act "caused or [brought] about" his own prosecution.

The existence of these material factual disputes is fatal to Plaintiff's summary judgment motion, and Plaintiff's motion should be denied.

## A. The District of Columbia Is Not Estopped from Litigating the Issue of Plaintiff's Unjust Imprisonment Act Claim

Plaintiff argues that the District of Columbia – an entity that was not a party to Plaintiff's criminal proceedings and could not legally intervene in Plaintiff's criminal proceedings – is precluded from requiring that Plaintiff meet his burden of proof in this civil action, which is entirely independent of his criminal proceedings.  In support, Plaintiff raises both collateral and judicial estoppel as bases for avoiding his burden of proof in his claim for damages against the District.  As demonstrated below, neither collateral nor judicial estoppel apply here.

### a.   Collateral Estoppel Does Not Apply

Collateral estoppel renders conclusive an issue of fact or law only when the following factors apply:

> (1) the issue is actually litigated and (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by the parties or their privities; (4) under circumstances where the determination was essential the judgment, and not merely dictum.

*Davis v. Davis*, 663 A.2d 499, 501 (D.C. 1995).  "'The basic premise of preclusion is that parties to a prior action are bound and nonparties are not bound.'"  *In re Subpoena Issued to Commodity Future Trading Commission*, 370 F. Supp. 2d 201 (D.D.C. 2005) (quoting 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4449 (2d ed. 2002 & Supp. 2005)).  This "basic premise" applies to the case at bar as the District of Columbia was not a party to the prior action.

Plaintiff attempts to avoid the "basic premise" in several ways.  Plaintiff first tries to demonstrate that *DeWitt v. District of Columbia*, 43 A.3d 291 (D.C. 2012) is applicable here.  Pl.'s Mem. in Supp. at 7.  It is not.  The *DeWitt* matter involved the use of the well-recognized non-mutual version of collateral estoppel, where "one who was not a party to the original suit invokes collateral estoppel to prevent relitigation of an issue by a party to the original suit or his privy."  *Modiri v. 1342 Rest. Grp., Inc.*, 904 A.2d 391, 394 (D.C. 2006) (citing *Blonder-Tongue*

7

*Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 349-50 (1971)).  In that case, estoppel was applied against the plaintiff who was actually a party to the prior proceeding, unlike the District here.  *DeWitt* also is inapplicable as the estopped litigant – there the plaintiff – had the opportunity to appeal the ruling that he was estopped from challenging and did not.  *DeWitt*, 43 A.3d at 299.  Here, the District never had the opportunity to appeal the decision Plaintiff seeks to estop it from challenging, nor did it have the opportunity to actually litigate the issue before it was brought in this present case.[1]

To overcome the fact that the District was a non-party to the prior proceedings, Plaintiff tries to manufacture a privity relationship between the District and the United States where clearly none exists.  Generally, a party is in privity with a litigant where the party controls an action though not a party to it, the party's interests are represented by the party to the action, or the party is a successor in interest to the party in the action.  *See, e.g., Smith v. Jenkins*, 562 A.2d 610, 615 (D.C. 1989).  The District is not a successor in interest to the United States, and the District had no control, or even the ability to control, any stage of Plaintiff's criminal proceedings.

None of the cases Plaintiff cites in support of his dubious privity assertion are remotely persuasive.  In *Modiri*, for example, the court analyzed the use of non-mutual offensive collateral estoppel, where "'a plaintiff seeks to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff.'"  *Modiri*, 904 A.2d at 394 (quoting *Ali Baba Co. v. WILCO, Inc.*, 482 A.2d 418, 421-22 (D.C. 1984)).  The Court found

---

[1] Plaintiff, relying on *Oubre v. District of Columbia Dep't of Employment Servs.*, 630 A.2d 699 (D.C. 1993), asserts that it is "irrelevant" that the United States joined Plaintiff's motion to vacate and did not oppose the motion for certificate of innocence because the issues were submitted to the court and the United States had the opportunity to litigate.  Pl.'s Mem. in Supp. at 8.  The plaintiff in *Oubre* had actually previously stipulated to facts at issue in the prior proceedings.  *Oubre*, 630 A.2d at 702-03.  Thus, if the United States was trying to relitigate the issue of Plaintiff's innocence, the failure to challenge at the prior proceedings would indeed be "irrelevant."  The District, of course, never had an opportunity to intervene, stipulate, or litigate the issues that were essential to the judgment to which the Plaintiff seeks to bind the District.  Thus, the issues were not fully and fairly litigated by the District.

that the plaintiff there was estopped because he had both privity of contract and a shared property

interest with Creative Hairdressers, the party to the original suit.  Indeed, Modiri would have

been responsible for indemnifying Creative Hairdressers under the terms of his lease.  *Modiri*,

904 A.2d at 400.  No remotely comparable obligations exist between the District and the United

States:  there is no contractual relationship, no shared property interest, and no obligation for the

District to pay any claim under the federal unjust imprisonment act that Plaintiff had against the

United States arising from the United States' acknowledgement of Plaintiff's actual innocence.[2]

Here, unlike in *Modiri*, the District has no privity with the federal government and therefore

absolutely no opportunity to litigate the issue to which the Plaintiff seeks to bind the District.[3]

Plaintiff's attempts to elevate the United States' authority to prosecute certain criminal

offenses in the District to a privity relationship with the District ignores the separate sovereignty

of these two entities.  In so doing, Plaintiff refers to several cases that speak solely to the United

States' role in prosecuting crimes in the District.  *See* Pl.'s Mem. in Supp. at 10 (citing *In re*

*Prosecution of Crowley*, 978 A.2d 608 (D.C. 2009); *Wilson v. United States*, 424 A.2d 130 (D.C.

1980)).  These cases only establish that authority to prosecute crimes is reserved at the federal

level due to the District's historical status and the grant or withholding of local governmental

authority by Congress; they do not address the principles of Home Rule or the fact that the

United States has no involvement in civil actions for damages against the District.  Moreover,

Plaintiff also overlooks the fact that in some criminal cases, the District possesses "a separate

---

[2] As further evidence of the lack of privity between the United States and the District, D.C. Code § 1-109 specifically places liability for any acts of the District on the District, and expressly absolves the United States from any liability resulting from acts or proceedings against the District.  Thus, these entities have no shared interest.

[3]*Modiri* is instructive on the fairness aspect of estoppel.  There, the court questioned the potential for unfairness to the defendant posed by preventing the defendant from litigating an issue previously found against the defendant, even though the defendant had the opportunity to litigate the issue itself.  *Modiri*, 904 A.2d at 395.  Plaintiff cannot seriously contend that the United States somehow represented the District's interests in the post-conviction proceedings as it would be highly disingenuous to suggest that an entity's interests are served by another entity creating liability for it in a legal proceeding in which the uninvolved entity had no ability to intervene.

status before the courts to litigate as a party different from the United States." *District of Columbia v. Ray*, 305 A.2d 531, 534 (D.C. 1973).

The other cases Plaintiff cites are likewise inapposite. *United States v. Mills* simply applies double jeopardy to the same criminal conduct that was already the subject of prosecution by the United States. 964 F.2d 1186 (D.C. Cir. 1992) (*en banc*). This again emphasizes the role of the United States in criminal prosecutions; it does not establish that the District should be civilly estopped from challenging collateral issues that may have been raised in those criminal proceedings. Likewise, *Goode v. Markley* stands for no more than the proposition that, for the purpose of criminal violations only, the United States and the District are a single sovereign. 603 F.2d 973 (D.C. Cir. 1979). It does not stand for the proposition that Plaintiff seeks to assert here – that actions of the United States can bind the District to civil liability based on nothing other than that they were actions of the United States.

Plaintiff also seeks to establish privity by asserting that the United States "clearly represented the District of Columbia's interests in the Innocence Protection Act litigation." Pl.'s Mem. in Supp. at 11. Plaintiff offers no evidence of any agreement between the District and the United States for the United States to "represent" the District, or any law that requires the United States to represent the District's interest. It does not follow that the United States "represents" the interests of the District in all respects simply because the United States maintains the authority to prosecute many of the crimes in the District of Columbia. In prosecuting these offenses, the United States represents its own sovereign – the United States. Moreover, our Circuit has noted that there are "specified 'limited circumstances' in which a nonparty may be adequately represented by a party to prior litigation: class or representative suits, or suits in which the nonparty exercised control of the litigation on behalf of a party." *Holland v. National*

*Mining Assoc.*, 309 F.3d 808, 813 (D.C. Cir. 2002) (citing *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989)).[4]   Those limited circumstances are not present here, as the prior proceedings were not a class or representative suit, or a suit controlled by the District.

The *Felter* case relied on by Plaintiff only underscores the lack of a representational interest by the United States:  there, the Court stated that estoppel can bind a non-party where the party involved in the original proceeding acted as a "'fiduciary representative for the *beneficial interest* of the non-part[y].'"  *Felter v. Salazar*, 679 F. Supp. 2d 1, 9 (D.D.C. 2010) (emphasis added) (quoting *Sea-Land Servs. v. Gaudet*, 414 U.S. 573, 593 (1974)).  In that case, this Court found that such a beneficial interest existed as any benefit gained by the Affiliated Ute Citizens in its prior litigation conferred a financial benefit on the plaintiffs in *Felter*.  *Id.* at 11.  It defies logic to suggest that the District received some "beneficial interest" by the United States, in essence and according to Plaintiff's theory, agreeing to subject the District to civil liability to be paid from the funds of the District.  Rather than receive a financial benefit like the *Felter* plaintiffs, the District would be subject to a liability.[5]  Similarly, in the *Lewandowski* case, the court found the property clerk of the Metropolitan Police Department in privity with the United States because the clerk served as the officer for the United States in retaining Plaintiffs'

---

[4] This is distinguishable from *Montana v. United States*, 440 U.S. 147 (1979), also cited by Plaintiff, where the United States was found to be in privity to a contractor on a federal dam project who had litigated against the State of Montana the same issues the United States sought to litigate.  There, privity existed because the United States had required the earlier lawsuit to be filed by the contractor; it had reviewed and approved the complaint; paid the attorneys' fees and costs; directed an appeal from the state court to the Montana Supreme Court; directed the filing of a notice of appeal to the U.S. Supreme Court; and effectuated the abandonment of that appeal on the advice from the Solicitor General.  *Id.* at 155.

[5] While the United States also took a position that was arguably adverse to its own financial interest in Plaintiff's post-conviction proceedings, the federal equivalent of the Unjust Imprisonment statute has a cap on damages, unlike the District, that arguably facilitates the prompt resolution of claims. The United States, as the entity that actually prosecuted Plaintiff, proffered evidence of Plaintiff's guilt, and advocated for Plaintiff's incarceration, also had an incentive to right the wrong for which it was responsible.  Even Plaintiff recognizes that the United States "had a lot at stake in the earlier proceedings."  Pl.'s Mem. in Supp. at 9.  As the *Holland* court recognized, divergent interests prevent the District from being adequately "represented" by the United States.  *Holland*, 309 F.3d at 814 (citing *Cleveland County Ass'n for Gov't by the People v. Cleveland County Bd. of Comm'rs*, 142 F.3d 468, 474 (D.C. Cir. 1998)).

property for the purpose of the United States' prosecution of Plaintiff.  *Lewandowski v. Property Clerk*, 209 F. Supp. 2d 19, 22 (D.D.C. 2002).  Plaintiff has not cited any similar relationship – one where the District somehow serves the needs of the United States, to allow the District to be bound by the actions of the United States in a privity relationship under these circumstances.

The District's authority is derived from Congress; privity, on the other hand, requires some sort of direct relationship between the District and the United States which Plaintiff has not established here.  Plaintiff recognizes that the District's authority is derived from Congress, but claims that Congress has "established" a "pre-existing substantive legal relationship between the person to be bound and a party to the judgment."  Pl.'s Mem. in Supp. at 11 n.5 (citing *Taylor v. Sturgill*, 553 U.S. 880 (2008)).  Plaintiff has not provided (because none exists) citation to any Congressional establishment of a "relationship" that requires the District to be bound by judgments involving the United States.  *EDCare Mgmt. v. Delisi* likewise provides no support for Plaintiff's claim of a "relationship" between the District and the United States; there, the parties had the well-recognized legal relationship of assignor and assignee.  50 A.3d 448 (D.C. 2012).  No comparable relationship exists between the United States and the District.

Finally, Plaintiff ignores caselaw specifically finding that there is *no* privity between the United States and the District.  In *Randolph v. District of Columbia*, in holding that *res judicata* did not apply against the District, it was unequivocally recognized that:

> The United States and the District of Columbia are not the same party nor in privity with each other.  The District of Columbia is a municipal corporation and "may contract and be contracted with, sue and be sued, plead and be impleaded, have a seal, and exercise all other powers of a municipal corporation ***."  The United States, of course, is a sovereign power and entirely separate and distinct from the District of Columbia, a municipal corporation.

156 A.2d 686, 688 (D.C. 1959); *see also Johnson v. District of Columbia*, 835 A.2d 207 (D.C. 2004) (while the appellate court determined it lacked jurisdiction to consider the merits of

appellant's collateral estoppel claim on interlocutory appeal because jeopardy had not attached, it noted that trial judge had held that *Randolph* applied there was nothing "to suggest that the mutuality of interests between the District of Columbia and the United States are such that there really is sufficient privity to allow collateral estoppel" in the case before her).

Thus, collateral estoppel does not apply to bar the District from requiring Plaintiff to prove his case against the District.

### b.  Judicial Estoppel Does Not Apply

Plaintiff also seeks to apply judicial estoppel to the District.  "Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000).  The doctrine is equitable in nature and seeks to "prevent 'improper use of judicial machinery.'" *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *Konstantinidis v. Chen*, 626 F.2d 933, 938 (D.C. 1980)).  The decision to apply judicial estoppel is vested with the discretion of the court, and generally upon consideration of factors such as whether the initial position was "clearly inconsistent" with the position the party seeks to take subsequently, whether the party successfully persuaded the court to accept the prior position, and whether the opposing party would be unfairly advantaged if estoppel is not applied.  *See generally id.* at 750-51.

Notwithstanding that judicial estoppel is limited to situations where a party seeks to take a contrary position in litigation to one upon which the party previously prevailed, Plaintiff seeks to assert judicial estoppel against the District based upon the United States' position in Plaintiff's post-conviction proceedings, and some perceived benefit Plaintiff claims the United States received.  Pl.'s Mem. in Supp. ay 14.  Plaintiff has not, nor can he, point to any benefit that the

District of Columbia received from the position the United States previously took to justify

applying judicial estoppel here.[6]  Nor can Plaintiff identify any position that the District took that

is clearly inconsistent with the position it takes in this litigation.  *See Scarano v. Central Rail Co.*

*of New Jersey*, 203 F.2d 510, 513 (3d Cir. 1953) (judicial estopped prevents a party from using

"intentional self-contradiction" to obtain an unfair advantage).

More importantly, judicial estoppel cannot apply as *New Hampshire v. Maine* makes

clear that estoppel only applies to different positions taken by the same party.  *Id.; see also*

*American Cas. Co. of Reading, Pa. v. Skilstaf, Inc.*, 695 F. Supp. 2d 1256, 1261-62 (M.D. Ala.

2010) (noting that where two litigants were "considered different parties, [] judicial estoppel

cannot apply"); *In re Plymouth House Health Care Ctr.*, 2005 WL 2589201 (E.D. Pa. Mar. 15,

2005) ("judicial estoppel only arises when inconsistent positions are taken by the same party, not

different parties").  The District was not a party to Plaintiff's post-conviction proceeding, and has

never taken an inconsistent position on this issue.

Plaintiff seeks to dismiss this requirement by asserting that it does not "matter that the

United States was the named party in the earlier proceeding and the District is the named party

now."  Pl.'s Mem. in Supp at 13 n.8.  As *New Hampshire v. Maine* and all other cases that the

District is aware of that have considered the issue make clear, it does indeed matter that the

District was not a party.  The case upon which Plaintiff relies to support his privity argument,

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012), is

distinguishable as the court there, as have other courts, found privity between the administrator

---

[6] Plaintiff appears to assume that the District received *some* benefit, as he insists that the District should not be permitted "to seek a further benefit."  Pl.'s Mem. in Supp. at 14.  Plaintiff never states, however, what benefit the District already has received, just as Plaintiff has not identified an inconsistent position the District has taken.

of an estate and the beneficiaries of the estate.  No such relationship exists here.[7]  Moreover, in

the *Marilyn Monroe* case, the estopped party had received a financial benefit from its prior

position, and sought an additional financial benefit from the inconsistent position it sought to

take in the pending proceedings.  *Id.* at 998-99.  The District received no benefit in the past from

any position the United States took, and gains no automatic benefit in the current litigation.

Moreover, there is no unfairness to the Plaintiff in requiring him to prove his claim for

damages against the District.  Plaintiff's prior proceedings allowed Plaintiff the opportunity to

prove his claim for damages against the United States and obtain a generous financial settlement

from the federal government.  Plaintiff now seeks additional money damages from the District of

Columbia under a different statute; there is no unfairness to Plaintiff from requiring him to prove

his claim for damages as every litigant before this Court must.

Thus, judicial estoppel does not apply to this case.

### B.  There Exists a Material Factual Dispute as to Whether Plaintiff's Misconduct Caused or Brought About His Own Prosecution

Plaintiff cannot prevail on his motion for summary judgment.  The unjust imprisonment

statute prohibits a litigant from recovering damages from the District where the litigant "by his

misconduct, cause[d] or [brought] about his own prosecution."  D.C. Code § 2-422(2).  Like any

statute constituting a waiver of sovereign immunity, the provisions of the District's unjust

imprisonment act should be narrowly construed.  *See, e.g., Gwinn v. District of Columbia*, 434

A.2d 1376, 1378 (D.C. 1981).  As the District's counterstatement of material facts in dispute

demonstrates, and while undisputed at the time of Plaintiff's initial criminal proceedings, the

---

[7] And, plaintiff's attempt to create a privity relationship between the District and the United States certainly undermines his argument that he is permitted to pursue additional compensation from the District of Columbia under the Unjust Imprisonment Act, as the District would then be permitted to argue that plaintiff is bound by the releases in Plaintiff's settlement with the United States.  In such a scenario, *Plaintiff* would then be judicially estopped from taking an inconsistent position in his own litigation in order to gain an additional benefit.

evidence in the record is now disputed as to whether Plaintiff actually confessed responsibility

for the Schilling rape and homicide to government witness Gerald Smith.  Defs.' Stmt. ¶¶ 3-4; 9-

12; 16.  Additionally, there is a factual dispute as to whether Plaintiff's prior wrongdoing

brought about his own prosecution.  Defs.' Stmt. ¶¶ 5-8; 17-18.

> ### a.   There Is a Factual Dispute, Developed During the Post-Conviction Phase As to Whether Plaintiff Actually Confessed Guilt for the Schilling Homicide to Gerald Smith

While there is very little caselaw interpreting the District's statute, courts that have

considered similar language in the federal statute have found "the clearest example" of

misconduct to be "the defendant who either falsely confesses to a crime or intentionally

withholds exculpatory evidence."  *Betts v. United States*, 10 F.3d 1278, 1285 (7th Cir. 1993); *see

also United States v. Keegan*, 71 F. Supp. 623, 638 (D.C.N.Y. 1947) (offering as examples of

"misconduct" under the statute:  "an attempt to flee, a false confession, the removal of evidence,

or an attempt to induce a witness or an expert to give false testimony or opinion, or an analogous

attempt to suppress such testimony or opinion.").[8]

Here, it is undisputed that Mr. Smith testified under oath at trial that Plaintiff confessed to

Mr. Smith that Plaintiff raped and murdered Ms. Schilling.  Plaintiff now disputes, however, that

this confession actually occurred, and Mr. Smith cannot recall one way or the other anything

about Mr. Gates or Mr. Gates' criminal trial.  The existence of this factual dispute as to whether

---

[8] The federal statute provides as follows:

   (a)   Any person suing under section 1495 of this title [waiving sovereign immunity for the federal government] must allege and prove that:

     (1)  His conviction has been reversed or set aside on the ground that he is not guilty of the offense of which he was convicted, or on new trial or rehearing he was found not guilty of such offense, as appears from the record or certificate of the court setting aside or reversing such conviction, … and

     (2)  He did not commit any of the acts charged or his acts, deeds, or omissions in connection with such charge constituted no offense against the United States, or any State, Territory or the District of Columbia, and he did not by misconduct or neglect cause or bring about his own prosecution.

   (b)   Proof of requisite facts shall be by a certificate of the court or pardon wherein such facts are alleged to appear, and other evidence thereof shall not be received.

28 USC § 2513.

or not Plaintiff confessed is material for the purposes of the Unjust Imprisonment Act.  *See*

*Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) ("A fact is 'material' if a dispute over it

might affect the outcome of a suit under governing law; factual disputes are 'irrelevant or

unnecessary' do not affect the summary judgment determination.").[9]  Thus, Plaintiff cannot

prevail on his motion for summary judgment.

### b.  There Is a Factual Dispute As to Whether Plaintiff's Involvement in Other Criminal Activity Contributed to His Prosecution

It is without dispute that very soon before the rape and murder of Catherine Schilling

occurred, Plaintiff assaulted another young woman in the same vicinity.  Like the federal statute,

"the plain language of the [District's] statute dictates that any 'misconduct or neglect' that

'cause[s] or bring[s] about' a petitioner's prosecution renders his ineligible for a certificate of

innocence." *United States v. Graham*, 608 F.3d 164, 176 (4th Cir. 2010).[10]  As courts have

observed, "the statute expressly requires a causal connection between the petitioner's conduct

and his prosecution…." *Betts v. United States*, 10 F.3d 1278, 1285 (7th Cir. 1993).[11]

The evidence in this case demonstrates such a causal connection:  Plaintiff acknowledges

he assaulted Ms. Benoff, and both Plaintiff and former AUSA Harrington agreed that Plaintiff's

other crimes played a role in Plaintiff's prosecution as the jury heard evidence of the other crime

---

[9] Moreover, the fact that Plaintiff might contend that Mr. Smith's prior testimony is not credible due to the financial gain and considerations he was given in exchange for his testimony is not relevant for a determination of summary judgment.  "[A] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1978)); *see also Arrington v. United States*, 473 F.3d 329 (D.C. Cir. 2006).

[10] Like the federal statute, the "first clause [of the District's statute] requires a petitioner to prove that he did not commit the charged criminal acts or that they do not constitute a crime; the second clause requires him to prove that his misconduct or neglect did not cause or bring about his prosecution….Therefore, the two clauses require a court to ask two distinct questions about the defendant's conduct." *Graham*, 608 F.3d at 176.

[11] *But see Eastridge v. United States*, 602 F. Supp. 2d 66 (D.D.C. 2009) (interpreting the provision to apply to "'those who, though innocent, had negligently or willfully failed to take the necessary measures to avoid conviction.'") (quoting *Osborn v. United States*, 322 F.2d 835, 843 (5th Cir. 1963)).

from the victim of that assault.[12]   Thus, a material factual dispute exists as to whether Plaintiff's

assault of Ms. Benoff caused or brought about Plaintiff's criminal prosecution and thus renders

him ineligible for the relief he seeks here.

### III.     Conclusion

As demonstrated above, Plaintiff cannot meet his burden to demonstrate that no material

factual disputes exist which would prevent him from prevailing on his claim for damages against

the District.   Thus, Plaintiff's motion for partial summary judgment should be denied.

Respectfully submitted,

IRVIN B. NATHAN
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation

KIMBERLY M. JOHNSON [435163]
Chief, General Litigation Sec. I

/s/ Wayne C. Beyer
WAYNE C. BEYER [452245]
Assistant Attorney General

/s/ Shana L. Frost
SHANA L. FROST [458021]
Assistant Attorney General
441 Fourth Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6534
Fax: 741-8934
shana.frost@dc.gov

---

[12] This is consistent with the reasoning of the *Betts* court:  there, the petitioner's actions or failure to act "mislead the authorities into thinking he had committed an offense."  *Betts*, 10 F.3d at 1285.  Plaintiff's prior bad act led authorities to believe that because Plaintiff had committed another offense so strikingly similar to the Schilling rape and murder, Plaintiff must have also committed the crimes against Schilling.  This of course prompted prosecutors to seek, and obtain from the Court, the admission of the prior crime under the exception to the rule that generally prohibits the introduction of other crimes of a defendant.  *See* Fed. R. Evid. 404(b).